## WISCONSIN v. DULUTH.

Where Congress has, in the exercise of its lawful authority, inaugurated or adopted a system for the improvement of a harbor, and is, by appropriating the public moneys, carrying it out, this court has no authority to prescribe the manner in which the work shall be conducted, or to forbid its completion, or to require the undoing of that which has been done.

ORIGINAL.

The facts are stated in the opinion of the court.

*Mr. I. C. Sloan* and *Mr. James B. Beck* for the complainant.
*Mr. C. K. Davis, contra.*

MR. JUSTICE MILLER delivered the opinion of the court.

This is a bill in chancery, filed in this court by the State of Wisconsin, by virtue of the constitutional provision which confers upon the court jurisdiction of suits between the States and between a State and citizens of other States. To the bill as originally brought the city of Duluth, as a corporation of the State of Minnesota, and, therefore, a citizen of that State, and the Northern Pacific Railroad Company, a corporation organized under an act of Congress, were made defendants. Whether the jurisdiction of the court could have been sustained in regard to the latter corporation, it is not necessary to inquire; for the plaintiff, before the final hearing, dismissed the bill as to the railroad company: and we are now, after answer, replication, and a large amount of evidence, to render our decree as between the State of Wisconsin and the city of Duluth.

This city is situated on the northern shore of Lake Superior, near its western extremity; and about seven or eight miles south-east of it, on the Wisconsin shore, is Superior City. A narrow strip of land, varying from three to eight hundred feet in width, projects itself from the shore at Duluth into the waters of the lake about seven miles, terminating just opposite Superior City, and opposite another point coming from the Wisconsin shore. The strip of land first mentioned is a part of the State of Minnesota, and is called Minnesota Point. West of Minnesota Point is a body of water lying parallel to it, and averaging a mile and a half or two miles in width, called Superior Bay; and still west of that a similar body, called St. Louis

Bay. Into this latter empties the St. Louis River, draining a large area of country west of the lake, and discharging the water thus collected into the lake.

St. Louis Bay and Superior Bay are spoken of as parts of St. Louis River, as enlargements of that stream; and testimony is taken to show that the water does not flow from the lake east of Minnesota Point into these bays, and other testimony to show that it does. Whether these bays are considered as parts of Lake Superior, or as mere expansions of the river, is in our view immaterial; for it is a fact not denied that there is a current due to the river through both these bays, which, in the natural condition of the points of land we have mentioned, discharged itself into the main body of the lake at the southern end of Minnesota Point; and that this point was the natural entrance and exit of vessels from the lake into the bays, and from the bays into the lake. And previous to the act of the city of Duluth, presently to be mentioned as the foundation of this suit, it was the only passage for vessels into and out of the bay. There was here in this bay a natural harbor where vessels could anchor in safety, and it was the only one on Lake Superior within fifty or sixty miles of its western limit. Here grew up Superior City, at which all vessels landed which came by the great lake system so far west. Outside of the bay and east of Minnesota Point the lake was rough, and there was no protection for vessels from the winds and waves.

The passage or channel at this narrow entrance, which by complainant is called the mouth of the St. Louis River, was never very deep, and the bar, if it may be so called, gave great trouble on this account. For several years prior to 1871, the United States had made appropriations to remedy this difficulty; and a plan had been adopted and money expended in the construction of piers on each side of the channel, which, by confining the flow of the water within narrow limits, would, by the process of scouring, keep the channel from filling up, and it was hoped would also deepen it.

By the spring of 1871, the city of Duluth, stimulated by the construction of the Northern Pacific Railroad westward from that city, which was its terminus on the lake, began to feel the need of a safe harbor of its own. A breakwater or pier built

into the lake was started by an appropriation by Congress, but was found to be unsatisfactory. The city of Duluth conceived and executed in a very short time the project of a canal across the narrow neck of Minnesota Point, near its connection with the main shore. By this means, vessels could enter Superior Bay, where it washed the shores of Duluth, as well as by the channel which let them into the same bay at Superior City. The railroad company and the city expended large sums of money to dredge out and make this harbor fit for the purposes of the large commerce which was expected to be brought there by the railroad. The canal across Minnesota Point was made about two hundred and fifty feet wide and from fifteen to eighteen feet deep; while the greatest depth at the mouth of the St. Louis River was ten and twelve feet.

The citizens of Superior City began to resist this action of the people of Duluth and the railroad company as soon as they comprehended the magnitude of the project. The contest has, from that time to the present, been urged before the State legislatures, before Congress, before the War Department (as having charge of appropriations to be spent in the improvement of navigation at these points), and in the courts, where there have been several suits before the one we are now about to decide.

The present suit was brought by State of Wisconsin, on the ground that the channel of the St. Louis River, as it flowed in a state of nature, was the common boundary between that State and the State of Minnesota, and that she has an interest in the continuance of the channel as an important highway for navigation and commerce in its natural and usual course. That the canal cut by Duluth across Minnesota Point, deeper than the natural outlet of the St. Louis River at its mouth, has diverted, and will continue to divert, the current of that river through Superior Bay into the lake by way of that canal. That the result of this is, that while the current cuts that canal deeper and gives an outlet for the water there at a lower level, it at the same time, by diverting this current from the old outlet, causes it to fill up, and thus destroys the usefulness of the river and bay as an aid of commerce, on which the State had a right to rely. The bill, after reciting the facts which we have already detailed, insists that the city of Duluth cannot, by any right of

her own nor by any authority conferred on her by the State of Minnesota, thus divert the waters of the stream.— the St. Louis River from their natural course, to the prejudice of the rights of the State of Wisconsin or of her citizens. It declares that, this canal at Duluth does this in violation of law; and it prays of this court to enjoin Duluth from protecting or maintaining it, and by way of mandatory injunction to compel that city to fill up the canal and restore things in that regard to the condition of nature in which they were before the canal was made.

The answer, while admitting the construction of the canal, denies almost every other material allegation of the bill. It denies especially that the canal has the effect of changing the course of the current of the river, or does any injury to the southern entrance to Superior Bay or diminishes the flow of water at that point.

A large amount of testimony, professional and non-professional, is presented on that subject. The answer also sets up, as an affirmative defence to the relief sought by the bill, that the United States, by the legislative and executive departments of the government, have approved of the construction of the canal, have taken possession and control of the work, have appropriated and spent money on it, and adopted it as the best mode of making a safe and accessible harbor at the western end of the great system of lake navigation.

Many very interesting questions have been argued, and ably argued, by counsel, which we have not found it necessary to decide. The counsel for defence deny that the State of Wisconsin has any such legal interest in the flow of the waters in their natural course as authorizes her to maintain a suit for their diversion. It is argued that this court can take cognizance of no question which concerns alone the rights of a State in her political or sovereign character. That to sustain the suit she must have some proprietary interest which is affected by the defendant. This question has been raised and discussed in almost every case brought before us by a State, in virtue of the original jurisdiction of the court. We do not find it necessary to make any decision on the point as applicable to the case before us.

, Nor shall we address ourselves to the consideration of the mass of conflicting evidence as to the effect of the canal on the flow of the waters of Superior Bay.

We will first consider the affirmative defence already mentioned; for, if that be found to be true in point of fact, it will preclude any such action by this court as the plaintiff has prayed for.

: It is to be observed, as preliminary to an examination of the acts of the general government in the special matter before us, that the whole system of river and lake and harbor improvements, whether on the sea-coast or on the lakes or the great navigable rivers of the interior, has for years been mainly under the control of that government, and that, whenever it has taken charge of the matter, its right to an exclusive control has not been denied. The operations of the government in this regard have been conducted by the bureau of engineering, as part of the War Department, to which Congress has confided the execution of its wishes in all these matters. That department has mapped out in suitable geographical divisions the work thus imposed upon it, and placed these under the control of officers who are in charge of them. These are again subdivided; so that while the lake system, or, at all events, the western lake system, is in the charge of one general superintendent, the separate works which at different places are conducted under him have each another engineering officer, who has special charge of those works.

For many years past, Congress has been in the habit of passing an annual appropriation bill, called the river and harbor bill, devoted to works of this class exclusively; and in these bills it appropriates specific sums to specific works, either already commenced and unfinished, or for new works thereby authorized, or sums necessary for the safety and protection of works already in existence. The money thus appropriated is expended, as we have said, under the direction of the War Department. It cannot be necessary to say that when a public work of this character has been inaugurated or adopted by Congress, and its management placed under the control of its officers, there exists no right in any other branch of the government to forbid the work, or to prescribe the manner in which it shall be conducted

With these observations, we proceed to inquire what the general government has done in the matter before us. As we have already stated, it had for several years been at work under appropriations by Congress, prior to the construction of the canal at Duluth, in the effort to deepen the channel at the mouth of the St. Louis River, but, we may infer, with little success beyond preventing it from filling up. The rapid growth of the city of Duluth, consequent upon its being made the terminus of the railroad, had attracted attention to the necessity of harbor improvements at that point; and Congress had made appropriations for a breakwater, which had been partially constructed outside of Minnesota Point in the main water of the lake. But this had proved a failure; and it was seen that no safe harbor for the vast commerce which was expected to be created at that place by the North Pacific Railroad could be secured in that mode. The city of Duluth and the railroad company, impatient of relief from Congress, inaugurated, therefore, in 1871, the system of improving the inner harbor in the waters of Superior Bay, and effecting an entrance into that harbor by the canal across Minnesota Point. The canal was completed sufficiently for use in that year, and the dredging of the harbor commenced. The matter was in this condition when Congress, by the river and harbor bill approved March 3, 1873, appropriated, "for the purpose of dredging out the bay of Superior, from the natural entrance to the docks of Superior and Duluth, and preserving both entrances from the lake thereto, $100,000." The whole sheet of water, as we have said, lying west of Minnesota Point, from one to two miles wide, and extending from Duluth on the north shore to Superior City on the south, was Superior Bay. There was but one entrance into that bay from the lake until the canal was made. There were no docks at Duluth but those made by the railroad company and the city in the inner harbor at the upper end of that bay. We see, then, at once, that Congress, recognizing what had been done by private enterprise at Duluth, determined to place that harbor and that canal under the same protection and to provide for them in the same appropriation which covered the entrance and the harbor at Superior City. Hence, $100,000 was appropriated as one item, for both entrances and

for both improvements, to be administered by the same officers as their judgment might dictate. The following extract from the report of the officer in charge of the matter shows what was done under the appropriation : —

1. Completing the pier at the natural entrance to Superior
   Bay . . . . . . . . . . . . . . . . . $25,000
2. Dredging between the piers at the natural entrance . . 11,340
3. Dredging from natural entrance to docks at Superior
   City . . . . . . . . . . . . . . . . 12,000
4. Repairing pier at Duluth entrance . . . . . . . . 19,500
5. Dredging between piers at Duluth entrance and from
   the piers to the docks of Duluth . . . . . . . 16,400

This dredging was in the inner harbor, and the breakwater was thenceforth abandoned as a government work. An estimate made by the engineer department for the next year's appropriations, required for the maintenance of the Superior City entrance, $10,000; for the Duluth entrance, $10,000; and for dredging the bay of Superior, $100,000 : and the appropriation bill, among other items, had, for continuing the improvement of the entrance to the main harbor of Duluth, $10,000.

Of this appropriation, the engineer in charge says that some repairs to the piers (of the canal) were made, and 45,171½ cubic yards were dredged from the inside harbor.

By the act entitled " An Act making appropriations for the repair, preservation, and completion of certain public works in rivers and harbors, and for other purposes, approved March 3, 1875, there was ' appropriated, to be expended under the direction of the Secretary of War, for the repair, preservation, and completion of the public works hereinafter named; viz., For dredging the inside harbor of Duluth, $35,000.' "

In the report of the chief of engineers for the year 1875, it is further stated : —

" The appropriation of $35,000, made in the river and harbor bill, approved March 3, 1875, restricts the application of that sum to dredging the inside harbor, and during the present fiscal year it is proposed to continue the dredging on the anchorage ground.

" The north pier of the canal, which was not built by the United States, is in a very precarious state, owing to its being undermined

The estimated cost of the present urgent repairs is $6,300; and as every year some repairs are necessary, an appropriation of $10,000 for this purpose is needed."

And in the act of Aug. 1, 1876, there is the following paragraph : —

"For the improvement of the harbor at Duluth, Minn., $15,000. Said appropriation is made upon the express condition that it shall be without prejudice to either party in the suit now pending between the State of Wisconsin, plaintiff, and the city of Duluth and the Northern Pacific Railroad, defendants."

The hostility of Superior City and of the State of Wisconsin could not avail to defeat the appropriation; but as this suit was then pending, the clause that it should be without prejudice to any one in the suit was inserted.

It was not needed. The Congress of the United States had themselves before this, adopted, recognized, and taken charge of this work. It had placed it on precisely the same ground, and provided for it in the same paragraph, and out of the same aggregate sum of money, that it did the work at the original entrance, as it is aptly called, at the mouth of the river. It had abandoned the breakwater as a failure, and as unnecessary, in consequence of this new and more useful improvement. The War Department had accepted the charge of the work, had expended the appropriations made, and had now for several years made the same regular estimates for this work that it did for all others under its control and management. And though the State of Wisconsin had brought her suit in this court to abate the work as a nuisance, and Congress was made aware of the fact, it still, in 1876, made the usual appropriation, and the War Department still had the work in charge; and the Congress cautiously said, this shall prejudice no one in the suit, but we shall go on notwithstanding, and continue this system of improvement.

We do not feel called upon to make an argument to prove that these statutes of the Congress of the United States, and these acts of the Executive Department in carrying those statutes into effect, constitute an adoption of the canal and harbor improvement started by the city of Duluth, and a taking

exclusive charge and control of it.   That they amount to the declaration of the Federal government, that we here interpose and assert our power.   We take upon ourselves the burden of this improvement, which properly belongs to us, and that hereafter this work for the public good is in our hands and subject to our control.

If the merest recital of these acts of Congress, and of the War Department under them, do not establish that proposition, we can have little hope of making it plain by elaborate argument.

Nor can there be any doubt that such action is within the constitutional power of Congress.   It is a power which has been exercised ever since the government was organized under the Constitution.   The only question ever raised has been how far and under what circumstances the exercise of the power is exclusive of its exercise by the States.   And while this court has maintained, in many cases, the right of the States to authorize structures in and over the navigable waters of the States, which may either impede or improve their navigation, in the absence of any action of the general government in the same matter, the doctrine has been laid down with unvarying uniformity, that when Congress has, by any expression of its will, occupied the field, that action was conclusive of any right to the contrary asserted under State authority.   The adjudged cases in this court on this point are numerous.

This subject was recently very fully considered in *South Carolina* v. *Georgia et al.*, 93 U. S. 4, and at this term in *Pound* v. *Turk*, 95 id. 459.   The doctrine was settled, however, long before this.   The following cases are fully in point: *Gibbons* v. *Ogden*, 9 Wheat. 1; *Wilson et al.* v. *The Blackbird Creek Marsh Co.*, 2 Pet. 245; *The Wheeling Bridge Case*, 18 How. 421; *Gilman* v. *Philadelphia*, 3 Wall. 713.

If, then, Congress, in the exercise of a lawful authority, has adopted and is carrying out a system of harbor improvements at Duluth, this court can have no lawful authority to forbid the work.   If that body sees fit to provide a way by which the great commerce of the lakes and the countries west of them, even to Asia, shall be securely accommodated at the harbor of Duluth by this short canal of three or four hundred

feet, can this court decree that it must for ever pursue the old channel, by the natural outlet, over water too shallow for large vessels, unsafe for small ones, and by a longer and much more tedious route?

When Congress appropriates $10,000 to improve, protect, and secure this canal, this court can have no power to require it to be filled up and obstructed. While the engineering officers of the government are, under the authority of Congress, doing all they can to make this canal useful to commerce, and to keep it in good condition, this court can owe no duty to a State which requires it to order the city of Duluth to destroy it.

These views show conclusively that the State of Wisconsin is not entitled to the relief asked by her bill, and that it must, therefore, be dismissed with costs.

*So ordered.*