## THE JOHNS HOPKINS.

(*Circuit Court, D. Massachusetts.* August 14, 1882.)

1. COLLISION—BETWEEN STEAMER AND SAIL VESSEL.

   In case of a fog, and in a place much frequented by vessels, it is as much the duty of a sail vessel to go at a moderate rate of speed as it is the duty of a steamer.

2. SAME—LOOKOUT.

   In a case where, besides a man forward, stationed as a lookout, there were two persons on watch in the pilot-house of a large ocean steamer, the lookout was sufficient.

3. SAME—EXCESSIVE SPEED IN FOG.

   Where a sail vessel in a fog was going at twice the speed of an approaching steamer, and neglected to show a torch-light, and the steamer was going as slow as she could go against a head-wind and a head-sea, and as soon as the steamer saw the light of the sail vessel orders were given to stop and reverse the engine, she is not in fault for a collision which ensues, from the sail vessel attempting to cross the course of the steamer.

In Admiralty.

*John C. Dodges & Sons,* for libelants.

*Morse & Stone,* for claimants.

Before HARLAN and LOWELL, JJ.

LOWELL, C. J. At about 9 o'clock on the night of February 26, 1881, the bark Fury came in collision with the steamer Johns Hopkins, off the coast of Cape Cod, near Chatham. A dense fog had shut in some half hour before. The bark was sailing with the wind nearly aft, and making eight or nine knots through the water, and had besides, as I understand the evidence, a current of about two knots in her favor. Her lookout reported a light to the mate, who was the officer of the deck, and was standing on the forward part of the quarter-deck. The mate looked and saw a green light, and gave the word "hard a-starboard," in order, as he says, to keep green light to green light. The helmsman began to put the wheel to starboard, when the pilot, who was near the wheel, and did not see the light, and thought that they were meeting a sailing ship, and that the mate had given the order to port, ran to the wheel and had it put hard to port, where it was kept until some time after the collision. The bark, under her port helm, crossed the bows of the steamer, and received a glancing blow on her port quarter, near the stern, which caused a damage estimated in the libel at $3,000. The total claim is $3,500. The bark did not display a torch. The mate says there

was not time to light one. The steamer had been slowed to one bell, when the fog came on, and was going against the wind and sea and current. Her master, whose evidence appears to have been given in a very fair and candid spirit, says: "Well, probably it might have been going three and one-half miles an hour. She was going as slow as she could go. She was under one bell, with a head-sea and a head-wind." The engineer fully confirms this statement. There was a competent' lookout on the top-gallant forecastle. Her master and second officer were in the pilot-house keeping a careful lookout, each leaning from a window. A light was reported nearly ahead, and all the witnesses of the steamer declare that it was a white light. We cannot say, upon the evidence, that there was a white light displayed by the bark; possibly her green light may have shown white in the fog. However, nothing came of this mistake. Orders were immediately given to stop and reverse the engine, and they were obeyed. Whether the headway of the steamer was lost before the collision, it is not easy to say. All her witnesses think that it was. The master, who is the least positive, as he is also the most reliable, says: "I suppose we were about at a standstill."

The district court pronounced against the libelants, finding that they were going too fast. The evidence below is reported to us with the addition of a deposition by the steamer's engineer, which shows that the engine was making 30 revolutions, just one-half of the usual number. Thereupon very able arguments have been addressed to us to prove what rate of speed would be obtained by 30 revolutions. This must be a matter of estimate, after all, and we do not consider that mathematics are more accurate, under the circumstances disclosed, than observation, because the amount of loss by the pitching of the vessel, and by the effect of the head-wind, sea, and current, are not ascertained with any approach to definiteness. We think the master's statement is as near the truth as we can get.

The broad facts are that a sailing vessel, going at least twice as fast as a steamer, showing no torch, and crossing the bows of the steamer, undertakes to say that the speed of the latter was not moderate. There seems to be some misunderstanding here as to the relative duties of the two classes of vessels. Before the law concerning this subject took the form of statutory rules, speed was always a question of due care in navigation, and although a sailing vessel could not stop and reverse after sighting another ship, she

could lessen her speed when she encountered a fog; and, in a place near the coast, much frequented by vessels, it was her duty to do so. Sailing vessels were condemned for going too fast in the following cases: *The Juliet Erskine*, 6 Notes Cas. Adm. & Ecc. 633; *The Virgil*, 2 Wm. Rob. 201; *The Pepperell*, Swab. 12.

Lowndes, in his treatise on the Admiralty Law of Collisions, says, at page 73, after speaking of steamers: "The same principles are, of course, applicable to sailing vessels." He cites two of the foregoing cases, and *The Girolamo*, 3 Hagg. 169.

The sailing rules, which were identical in the chief maritime countries, required steam-ships to go at a moderate speed in a fog, and said nothing about sailing vessels, which may have led their owners to suppose that they were relieved from this obligation. But this law was not intended to change the rules of seamanship, excepting where the statute differed from or added to those rules; and we find by the *dicta* in certain cases in the supreme court that in places like this channel off Cape Cod sailing ships should not carry a "press of sail," which means that they shall go at a moderate speed; for the amount of sail which would be a "press" must depend upon the amount of wind, and the consequent rate of progress. See *The Morning Light*, 2 Wall. 550; *The Colorado*, 91 U. S. 962. The revised sailing rules of 1879, in England, provide, (article 13 :) "Every ship, whether a sailing ship or a steam-ship, shall, in a fog, mist, or falling snow, go at a moderate speed." 4 Prob. Div. 247. This article puts sailing ships on the same footing as steam-ships, on the open ocean as well as in channels and frequented places. We hold that a steamer is bound, in all places, to go at moderate speed in a fog, and that a sailing vessel is bound to do so in such a place as this. The neglect to show a torch, and the act of crossing the bows of the steamer, are excused by the libelants on the ground of want of time, and the suddenness of the emergency. The lights of the steam-ship were much larger and higher than those of the bark, and could be seen sooner from the bark than her lights could be seen from the steamer. We are not sure that there was not time to show a torch, as required by Rev. St. § 4234. There is some reason to believe that the lookout did not report the light as a mast-head light, as he should have done, and that the mate was not at first aware that the vessel was a steamer. There was time for the bark to cross the bows of the steamer, and it can hardly be that this could take less time than the simple lighting of a torch, if one were ready. Supposing, however, that the sailing vessel cannot be blamed, it is

necessary, in order to a recovery, that some fault should be attached to the steamer. Two faults are found with her by the libelants:

1. That there was only one lookout forward. Cases are cited in which it is said to be usual for large ocean steamers to have two lookouts. *Chamberlain* v. *Ward*, 21 How. 548; *The Colorado*, 91 U. S. 692. But these declarations constitute no part of the matter in judgment in those cases. The maritime law has not declared that one man forward may not be enough; and in this case, where, besides such a man, there were two persons on watch in the pilot-house, we hold that the lookout was sufficient.

2. The rate of speed. The phrase so often quoted from the decision in *The Batavia*, 9 Moore, P. C. 286, that the rate of speed in every case should be so moderate as to enable a steamer to do what the law requires her to do, cannot be taken literally. A fog may be so dense that a collision will take place when neither party is in fault. Some persons have understood that in such a state of the weather the steamer must lie to or anchor; and it was so argued in this case; and such is the necessary result of a literal interpretation of the *dicta* in some cases. It may be that a ship of any kind will be responsible for moving from one dock to another, or for beginning a voyage, in a dense fog, (see *The Borussia*, Swab. 94; *The Girolamo*, 3 Hagg. 169;) and so if the vessel had arrived at a usual anchorage and persisted in going further; but the fog in this case came on after the bark had left Vineyard Haven, and after the steamer had left Boston, and it is as certain that they were not required to lie to or anchor, as that "a moderate speed" does not mean no speed at all.

*The Colorado*, 1 Brown, Adm. 393, (91 U..S. 692,) is relied on by the libelants. There the sailing vessel had diminished her speed when the weather became thick from five or six knots to four; the steamer had but three men on deck, and the lookout was obliged to run to the wheel, though after he had reported the light; the speed of the propeller is found by Mr. Justice Clifford to have been five or six knots. A careful study of that case has shown us that the sailing vessel had taken every precaution possible, and that the propeller was condemned for the whole of her conduct taken together, rather than for any definite single fault.

Granting that a steamer should go as slowly as is reasonably possible, we think that this steamer did not exceed that rate. We are of opinion that the collision was caused by the acts and neglects of those who were navigating the bark, and that if they were excusable, which we do not think they were, the collision was without fault by

either party. This is the judgment of Mr. Justice Harlan and the circuit judge, and is to be entered as of a time before Mr. Justice Gray was assigned to this circuit.

Decree affirmed, with costs.

---

### Receiver—Appointment—Railroad Mortgage.

HAMMOCK *v.* FARMERS' LOAN & T. CO., U. S. Sup. Ct., Oct. Term, 1881. Appeal from the circuit court of the United States for the southern district of Illinois. The decision of the United States supreme court was rendered on April 24, 1882. Mr. Justice *Harlan* delivered the opinion of the court affirming the decree appealed from.

In Illinois, a judge has no authority to appoint a receiver of a railroad corporation in vacation; such authority is to be exercised by the court while in session. Punctuation is no part of a statute. Courts, in construing statutes or deeds, should read them with such stops as will give effect to the whole. We are not prepared to hold that the power of a judge in vacation to exercise the important judicial function of appointing a receiver of a corporation, charged with public functions, was conferred by the introduction of a comma in the revised statute of a state, where the established doctrine is that no judicial functions can be exercised by a judge in vacation except where expressly or especially authorized by statutes. Where the circuit court of the United States had lawfully acquired possession of property prior to any action in reference to it by the state court, the former had the right to retain possession, for all the purposes of the suit, for foreclosure of the mortgage thereon. The provisions of the statutes of Illinois giving the right to redeem as well lands or tenements sold under execution, as mortgaged lands sold under decrees of courts of equity, has no application to the real estate of a railroad corporation which, with its franchises and personal property, is mortgaged as an entirety, to secure the payment of money borrowed for railroad purposes. Its property, real and personal, and its franchises, should be sold as an entirety, and without right of redemption in the mortgageor, or in judgment creditors, as to the real estate. A railroad mortgage security, so far as the personalty of the corporation is concerned, is not embraced in the statutes of Illinois relating to chattel mortgages.

J. K. Edsall, for appellants.

R. E. Williams, for appellee.

Cases cited in the opinion: Taylor v. Carryl, 20 How. 583; Freeman v. Howe, 24 How. 450; Hagan v. Lucas, 10 Pet. 400; Peck v. Jenness, 7 How. 612; Blair v. Reading, 99 Ill. 609; Devine v. People, 100 Ill. 290; Keith v. Kellogg, 97 Ill. 147; Doe v. Martin, 4 Term Rep. 65; Price v. Price, 10 Ohio St. 316; Cushing v. Worrick, 9 Gray, 385; Gyger's Estate, 65 Pa. St. 311; Hamilton v. The R. B. Hamilton, 16 Ohio St. 432; Brine v. Insurance Co. 96 U. S. 627; Gue v. Tidewater Can. Co. 24 How. 262.

## County Bonds—Validity of.

RALLS COUNTY *v.* DOUGLASS, U. S. Sup. Ct., Oct. Term, 1881. Error to the circuit court of the United States for the eastern district of Missouri. The decision of the supreme court of the United States was rendered on March 6, 1882. Mr. Chief Justice *Waite* declared the opinion of the court affirming the decree of the circuit court.

County bonds issued in Missouri by a *de facto* court, sealed with the seal of the court, and signed by the *de facto* president, cannot be impeached in the hands of an innocent holder by showing that the acting president was not *de jure* one of the justices of the court. It cannot be shown as a defense to bonds issued by counties in Missouri, in payment of subscriptions to the capital stock of a company, and in the hands of innocent holders, that the company to whose stock the subscription was made was not organized within the time limited by its charter. Bonds issued by counties in Missouri during the years 1870 and 1871, in payment of subscriptions to the stock of railroad companies, without a vote of the people, are valid, if the subscription was made under authority of charters granted in 1857, which did not require such a vote to be taken. Such bonds and coupons issued in those years were admissible in evidence, in an action against the county for the recovery of the amount due thereon, without being stamped as obligations for the payment of money, under the provisions of the internal revenue law. It was not necessary to prove the order of the county court authorizing the president of the court to countersign the bonds, where there was no plea or answer sworn to, denying their execution. Where there was no averment in the petition to that effect, testimony was admissible to prove that plaintiff was a *bona fide* holder and owner.

H. A. Cunningham, for plaintiff in error.

John H. Overall, for defendant in error.

Cases cited in the opinion: State v. Douglass, 50 Mo. 596; Harbaugh v. Winsor, 38 Mo. 327; Bank of Missouri v. Merchants' Bank, 10 Mo. 130; Kayser v. Trustees, 16 Mo. 90; Smith v. Clark Co. 54 Mo. 81; St. Louis v. Shields, 62 Mo. 247; Macon Co. v. Shores, 97 U. S. 277; State v. Macon Co. Ct. 41 Mo. 453; Kansas City, etc., R. Co. v. Justices, 47 Mo. 349; State v. County Court, 51 Mo. 531; State v. Greene Co. 54 Mo. 550; Callaway Co. v. Foster, 93 U. S. 570; Scotland Co. v. Thomas, 94 U. S. 688; Henry Co. v. Nicolay, 95 U. S. 624; Cass Co. v. Gillett, 100 U. S. 592; State v. Garroutte, 67 Mo. 455; State v. Dallas Co. Ct. 72 Mo. 330; Douglass v. Pike Co. 101 U. S. 687.

## Commerce—Bridging Navigable Waters.

NEWPORT & CINCINNATI BRIDGE CO. *v.* UNITED STATES, U. S. Sup. Ct., Oct. Term, 1881. Appeal from the circuit court of the United States for the southern district of Ohio. This case was decided in the supreme court of the United States in April, 1882. Mr. Chief Justice *Waite* delivered the opinion of the court affirming the decree of the circuit court; *Miller, Field,* and *Bradley,* JJ., dissenting.

The paramount power of regulating bridges that affect the navigation of the navigable waters of the United States is in congress. It comes from the power to regulate commerce with foreign nations and among the states. The

withdrawal by congress of its assent to the maintenance of a bridge, when properly made, is equivalent to a positive enactment that from the time of such withdrawal the further maintenance of the bridge shall be unlawful, notwithstanding the legislation of the several states upon the subject. If modifications are directed, assent is in legal effect withdrawn unless the required changes are made. Where congress licensed the erection of a bridge over a navigable stream, and in express terms reserved to itself the power to revoke the franchise or require alterations in case experience proved that the structure which was to be erected substantially and materially interfered with navigation, it may withdraw its assent, or direct such modification or alterations in the structure in its own discretion, and the United States will not be liable for the expenses incurred in making such modifications or alterations.

William M. Ramsey, for appellant.

S. F. Phelps, Solicitor General, for the United States.

Cases cited in opinion: As to the power of congress over bridges, Wilson v. Blackbird Creek Marsh Co. 2 Pet. 252; The Wheeling Bridge Case, 18 How. 421; Gilman v. Philadelphia, 3 Wall. 729; The Clinton Bridge Case, 10 Wall. 462; Railroad Co. v. Fuller, 17 Wall. 569; Pound v. Turck, 95 U. S. 464; Wisconsin v. Duluth, 96 U. S. 387.

### City Bonds in Aid of Manufacturing Company.

CITY OF OTTAWA *v.* NATIONAL BANK, U. S. Sup. Ct., Oct. Term, 1881. The decision in this case was rendered by the supreme court of the United States on April 24, 1882. Mr. Justice *Harlan* delivered the opinion of the court affirming the judgment of the circuit court.

Where a city council had power, the voters consenting, to issue negotiable securities for certain municipal purposes, if the purchaser, under some circumstances, would have been bound to take notice of the provisions of the ordinances whose titles were recited in the bonds, he was relieved from any responsibility or duty in that regard by reason of the representation upon the face of the bonds that the ordinances provided for a loan for municipal purposes. Such a representation by the municipal authorities of the city would estop the city, as against *bona fide* holders for value, to say that the bonds were not issued for legitimate or proper municipal or corporate purposes. By the decisions of the supreme court of Illinois, municipal bonds, payable to bearer or to some named person or bearer, were excepted from the rule that notes payable to a person or bearer could not be transferred or assigned by delivery only, so as to authorize the holder to sue in his own name.

C. B. Lawrence, for plaintiff in error.

G. S. Eldredge, for defendant in error.

Cases cited in the opinion: Roberts v. Bolles, 101 U. S. 120; Hilborn v. Artus, 4 Ill. 344; Roosa v. Crist, 17 Ill. 450; Garvin v. Wiswell, 83 Ill. 217; Turner v. Railroad Co. 95 Ill. 143; Wall v. Monroe Co. 103 U. S. 77; Johnson v. Stark Co. 24 Ill. 75; Brush v. Reeves, 3 Johns. 439; Dean v. Hall, 17 Wend. 214; Cox v. United States, 6 Pet. 200; Andrews v. Pond, 13 Pet. 77; Bell v.

Bruen, 1 How. 169; People v. Tazewell Co. 22 Ill. 151; City of Pekin v. Reynolds, 31 Ill. 531; Prellyman v. Tazewell Co. 19 Ill. 406; Sherlock v. Winnetka, 68 Ill. 535.

### County Bonds—Nebraska.

DAVENPORT *v.* DODGE Co., U. S. Sup. Ct., Oct. Term, 1881. Error to the circuit court of the United States for the district of Nebraska. The decision in this case was rendered in the supreme court of the United States on March 20, 1882. Mr. Chief Justice *Waite* delivered the opinion of the court reversing the judgment of the circuit court.

A precinct is a mere subdivision of a county, and not a separate political entity, and bonds issued by authority of a vote of the precinct for public purposes must be issued in the name of the county of which the precinct forms a part; and suit on such bonds must be against the county, the judgment to be ·paid by a tax levied only on the taxable property of the precinct. A suit to obtain such a judgment is maintainable, although the state statute authorizing the issue of the bonds provides the special remedy by *mandamus* for their enforcement; yet inasmuch as a suit to obtain judgment on bonds or coupons is part of the necessary machinery of the federal courts in enforcing the writ of *mandamus*, which is in the nature of an execution, it will not be issued until judgment is obtained.

W. H. Munger and E. Wakely, for plaintiff in error.

William Marshall, for defendant in error.

Cases cited in opinion: State v. Dodge Co. 10 Neb. 20; Cass Co. v. Johnston, 95 U. S. 360; County Com'rs v. Chandler, 96 U. S. 205; Greene Co. v. Daniel, 102 U. S. 195; Graham v. Norton, 15 Wall. 427; Bath Co. v. Amy, 13 Wall. 244.

### Bonds in Aid of Railroads—Liability of Town.

AMERICAN LIFE INS. Co. *v.* TOWN OF BRUCE, U. S. Sup. Ct., Oct. Term, 1881. Error to the circuit court of the United States for the northern district of Illinois. The decision of the supreme court of the United States was rendered in this case on April 24, 1882. Mr. Justice *Harlan* delivered the opinion of the court reversing the judgment of the circuit court.

Where a statute authorizes a town to make a subscription in aid of a railroad, to be paid in bonds of the town, subject to the conditions that the road be so constructed as to pass through the town, and that a depot be located and maintained in the town, it cannot, after the bonds have been signed, sealed, and delivered by its constituted authorities to the railroad company, and have passed into the hands of *bona fide* holders for value, escape liability by showing that the conditions, or some of them, imposed by popular vote have not been complied with upon the part of the railroad company, even though the statute authorizing their issue especially provides that they shall not be valid till such conditions are complied with.

Henry Hazlehurst, Isaac Hazlehurst, and G. L. Fort, for plaintiff in error.

Phelps & W. Hallet Phelps, for defendant in error.

Cases cited in the opinion: Town of Eagle v. Kohn, 84 Ill. 292, distinguished; Brooklyn v. Insurance Co. 99 U. S. 370, followed.