STATE OF MISSOURI ex rel. and to Use of CAMDEN COUNTY, MO., et al. v. UNION ELECTRIC LIGHT & POWER CO. et al. No. 233.

District Court, C. D. Missouri, W. D. July 18, 1930.

Sid C. Roach (of Jones, Hocker, Sullivan & Angert), of St. Louis, Mo., and Morgan M. Moulder, Pros. Atty., of Linn Creek, Mo., for complainants.

Theodore Rassieur (of Rassieur & Goodwin), of St. Louis, Mo., and Edgar Shook (of Baker, Botts, Parker & Garwood), of Kansas City, Mo., for defendants.

REEVES, District Judge.

This is an action to enjoin the construction of a dam across the Osage river, near Bagnell, in Miller county, Mo. It is alleged by complainants that the object of said construction is to secure power for a hydroelectric plant, and that said plant is to be operated by the defendant Union Electric Light & Power Company solely for the purpose of generating electricity for profit. Although complainants assert that the Osage river and many of its tributaries are navigable in fact and in law, yet they say that the construction of said dam would not serve

to promote navigation thereon, but would impede same; that the size of said dam, as now contemplated, would inevitably create an immense reservoir and cause the inundation of vast tracts and bodies of land, the submergence of many public highways and school districts, and the permanent overflow of the village of Linn Creek in Camden county, which is now the county seat of said county; and that the courthouse and other public property situated in said Linn Creek would be flooded and rendered useless.

It is further alleged that said dam is not intended as a public improvement and in fact would not be for the public interest, but is wholly designed as a private enterprise for the generation of electricity to be disposed of commercially, and on account of the lake formed thereby a condition deleterious to the public health would be created.

The defendants, on their part, admit the proposed and intended construction of said dam. They assert, however, that it would be an aid and benefit to navigation. The defendants, and particularly the Union Electric Light & Power Company, plead the legal right to construct said dam, which, it says, is vested by virtue of Federal License Project 459 Missouri, granted by the Federal Power Commission, pursuant to the provisions of the Federal Water Power Act of June 10, 1920, being chapter 12, title 16 of the United States Code (16 USCA §§ 791–823). The authority of the Federal Power Commission, it is asserted, arises from clause 3, § 8, of article 1 of the Constitution of the United States, whereby power is vested in the Congress "to regulate commerce with foreign nations, and among the several States."

The defendants, and particularly the Union Electric Light & Power Company, plead compliance with said water power act and assert the right not only to construct said dam but to acquire by condemnation, if necessary, all property of a private or public nature, situated within the proposed reservoir or in any manner affected by said project.

Other questions and minor issues raised by the pleadings and evidence will be stated in the course of this memorandum opinion.

The evidence, on the part of the complainants, tended to show that navigation on the Osage river and its tributaries had been carried on uninterruptedly for many years, but that the volume of business had been so far reduced that it was practically negligible at the present time. Such navigation was seasonal and dependent in a large measure upon the stage of the rivers affected, which in turn were largely dependent upon uncertain rainfalls.

The evidence was undisputed that the dam, as proposed by the defendant Union Electric Light & Power Company, would have the effect to accumulate a vast body of water in a huge reservoir, and that the entire region within the valley of the Osage river and the valleys of its tributaries, for a distance of more than 100 miles, would be overflowed. This would result in submerging both public and private property, including the courthouse and jail in the village of Linn Creek, a large number of school districts, and at sundry points inundate the public highways. It was undisputed that Camden county would be divided in three parts by the lake to be formed, and that each part would be rendered inaccessible to the other parts.

It further appeared beyond question that a large portion of the more fertile bodies of land in Camden county, lying along and in close proximity to the Osage river and its tributaries, would be inundated, so that the county, so far as agriculture is concerned, would be permanently deprived of its most valuable productive areas. There was evidence as to the necessary withdrawal of such lands from state and local taxation and the serious effect that would follow upon the revenues of Camden county. There was evidence that unsanitary conditions would be created by the exposure of large areas covered with mud and bog due to the recessions of the lake.

The evidence on the part of the defendants showed that navigation on the Osage and its tributaries had been so greatly reduced in recent years that it was now negligible. It was admitted that valuable properties, both public and private, would be inundated. The testimony of the defendants, however, showed that no unhealthy conditions would result from the construction of said dam and reservoir, but that, on the contrary, the areas covered by mud and bog would be greatly reduced by reason of said construction.

The Osage river and its tributaries are subject to frequent and extensive overflow in their natural state. Much of the area to be taken as part of the proposed reservoir is now subject to overflow. Following such overflows, deposits are left similar to that which would follow the withdrawal of waters in the reservoir and are far more extensive.

The evidence, on the part of the defendants, tended to show that navigation would be materially benefited by the construction of said dam; that the Osage river would be rendered navigable for heavy draft boats between Warsaw in Benton county and Bagnell in Miller county; and that this would comprehend a distance of approximately 100 miles and would connect with railroad carriers at both of these points.

The evidence was that for many years there has not been continuous navigation, but that freight was ordinarily taken from the river at Bagnell and thereafter carried by railroad. There was much evidence that the release of water from the reservoir would much more evenly distribute the flow on the Osage river below the dam, and that navigation would experience a dependable and adequate flow of water. Moreover, the Missouri river would be affected somewhat favorably for navigation at periods of low water.

Many legal questions have been interposed touching both the right of the defendants to appropriate property already dedicated to public use and the ability of the defendants to comply with certain regulatory laws both of the national and state governments. All of these questions will be treated hereinafter.

■ 1. At the outset the court is concerned with the fundamental and jurisdictional question as to whether the project is one of federal judicial cognizance. As a postulate to a further consideration of the case, it must be acknowledged, and the parties so concede, that the national government, under the power "to regulate commerce with foreign nations and among the several states," has full and complete jurisdiction over all matters affecting navigation. Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 20 S. Ct. 96, 44 L. Ed. 136; Gibbons v. Ogden, 9 Wheat. 1, loc. cit. 229, 6 L. Ed. 23; Alabama Power Co. v. Gulf Power Co. (D. C.) 283 F. 606, loc. cit. 613. Moreover, this power and authority extends just as fully and completely to navigation upon the navigable waters wholly within a state.

In Sewell v. Arundel Corporation, 20 F. (2d) 503, loc. cit. 504, the Court of Appeals for the Fifth Circuit, said: "It is well settled that Congress has complete dominion over the navigable waters of the United States, whether wholly within the boundaries of a state or otherwise, and has authority to undertake and prosecute such work as may be thought necessary to improve their navigability. This authority includes the power to obstruct, and when Congress gives consent to the creation of an obstruction to navigation it ceases to be a nuisance and the courts are powerless to interfere. Wisconsin v. Duluth, 96 U. S. 379, 24 L. Ed. 668; Pennsylvania v. Wheeling & Belmont Bridge Co., 18 How. 421, 15 L. Ed. 435."

The above authorities, with many others that might be collated, express the law on this subject.

■ 2. It is equally a well-settled proposition of law that, "if a certain means to carry into effect any of the powers, expressly given by the constitution to the government of the Union, be an appropriate measure, not prohibited by the constitution, the degree of its necessity is a question of legislative discretion, not of judicial cognizance." McCulloch v. Maryland, 4 Wheat. 316, 4 L. Ed. 579.

■ 3. To the foregoing may be added the doctrine that has been laid down with unvarying uniformity: "That when Congress has, by any expression of its will, occupied the field, that action was conclusive of any right to the contrary asserted under State authority." Wisconsin v. Duluth, 96 U. S. 379, loc. cit. 387, 24 L. Ed. 668. The adjudged cases on this point are too numerous to require further citation of authorities.

4. With the foregoing propositions as to the authority, degree of necessity and exclusive control by Congress, in mind, the question as to what Congress has actually done may be intelligently discussed. As a preliminary to this discussion, the court announces a finding of fact to the effect that the evidence is rather overwhelming as to the benefits to navigation that will accrue from the proposed structure. At the present time navigation upon the streams affected has practically no commercial value, whereas vessels carrying heavy cargoes could ply without interruption for a long distance between two railroad carriers. The interruption created by the dam would be little greater, if any, than that experienced at the present time.

■ Complainants are correct in their contention that, if the construction and maintenance of the dam is for the prime and sole purpose of generating electricity for commercial purposes, and not for its influence upon navigation, then the subject-matter would not be within the power of the Congress or within the jurisdiction of this court. Addyston Pipe & Steel Co. v. United States, supra.

■ The Federal Water Power Act was approved June 10, 1920. It provided for a commission to be known as the Federal Pow-

er Commission. It was composed of the Secretaries of War, the Interior, and Agriculture. Said Commission was clothed with power—

"To make investigations and to collect and record data concerning the utilization of the water resources of any region to be developed, the water power industry and its re-lation to other industries and to interstate or foreign commerce. * * *

"To issue licenses to citizens of the United States, or to any association of such citizens, or to any corporation organized under the laws of the United States or any State thereof, or to any State, or municipality for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation, and for the development, transmission, and utilization of power across, along, from or in any of the navigable waters of the United States." Section 4 (16 USCA § 797).

It may be observed from the foregoing excerpts from the Federal Water Power Act that the Congress contemplated the utilization of the power created by such dams for industrial purposes. The fact, therefore, that the defendant Union Electric Light & Power Company contemplated the generation of electrical energy for industrial purposes is obviously not out of harmony with the announced purposes of the Congress.

In the notable case of McCulloch v. Maryland, 4 Wheat. 316, 4 L. Ed. 579, the court justified the incorporation of a national bank by the congress upon the theory that said bank might be useful as an agency of the government. Manifestly, the incorporators of said bank intended that the conduct of the institution should be for their profit and benefit. It must be held that the congressional power, under the Constitution, is such that provision of this character might be made for the improvement of the navigable waters of the United States. In re Southern Wisconsin Power Co., 140 Wis. 245, 122 N. W. 801; City of Newark v. Central R. R. Co. of New Jersey (C. C. A.) 297 F. 77.

■ 5. The next question in logical sequence would be to ascertain whether or not the Congress in the exercise of its constitutional power has actually occupied the field now in controversy. That the Congress might provide for the delegation of authority upon an agent, such as the Federal Power Commission, cannot be questioned. Oceanic Steam Navigation Co. v. Stranahan, 214 U. S. 320,

29 S. Ct. 671, 53 L. Ed. 1013; Brushaber v. Union Pacific R. R. Co., 240 U. S. 1, 36 S. Ct. 236, 60 L. Ed. 493, L. R. A. 1917D, 414, Ann. Cas. 1917B, 713; Alabama Power Co. v. Gulf Power Co. (D. C.) 283 F. 606, loc. cit. 615; Union Bridge Co. v. United States, 204 U. S. 364, 27 S. Ct. 367, 51 L. Ed. 523; Miller v. New York, 109 U. S. 385, 3 S. Ct. 228, 27 L. Ed. 971.

It must be assumed, therefore, that the Congress not only had the power, but that it was proper in the exercise of said power to delegate to the Federal Power Commission certain definite authority to carry out its purposes.

■ 6. It was contemplated under the Federal Water Power Act that preliminary permits and licenses should be issued by the Federal Power Commission, in respect of such constructions as might benefit navigation and at the same time develop industrial energy. As a condition precedent to the granting of such permits and licenses, the applicant was required to submit certain data and information as a basis for action by the commission.

The preliminary permit mentioned in the act was defined in section 5 (16 USCA 798) as being "for the sole purpose of maintaining priority of application for a license under the terms of this chapter for such period or periods, not exceeding a total of three years, as in the discretion of the commission may be necessary for making examinations and surveys, for preparing maps, plans, specifications, and estimates, and for making financial arrangements."

Apparently for the benefit of the commission and for its aid in determining the advisability of granting such permit, and as an admonition to the state and municipalities whose property might be affected, it was provided by said section 4 (16 USCA § 797): "That upon the filing of any application for a preliminary permit by any person, association, or corporation the commission, before granting such application, shall at once give notice of such application in writing to any State or municipality likely to be interested in or affected by such application; and shall also publish notice of such application for eight weeks in a daily or weekly newspaper published in the county or counties in which the project or any part thereof or the lands affected thereby are situated."

The notice here required was not in its nature such process as may be involved in judicial proceedings. Process emanates from the courts. The notice in question does not even emanate from one of the parties. It is

a public notice given by an administrative agency of the government to the state and such municipalities as might be interested in or affected by the project. It could not constitute the basis of an adverse ruling as affecting such state or municipalities. The undoubted object of such notice is to aid the Commission in gathering data and information as to whether it might be warranted in granting preliminary permits and thereafter a license, and to acquaint the state and municipal authorities with the probable demand for their public properties.

In this case the evidence showed conclusively that publications were made as provided by said statute, and that communications in writing were addressed and mailed to the proper parties.

■■ The records of the Commission affirmatively showed compliance with this provision of the law. Moreover, the evidence tended to show on behalf of the defendants that publications were made conformably to this requirement, and that letters were addressed to the proper representatives of the state and municipalities affected. It also appeared that the enterprise was of such magnitude and the reports concerning it so numerous that those clothed with authority must have had actual knowledge of the proposal. In fact in each case agreements were reached for compensation on account of probable damage. Criticism was specially made of the publication because the name "Bushnell" was used instead of the name "Bagnell" as indicating the approximate location of the proposed dam. The evidence showed common knowledge as to the locality of the dam, and that no one was deceived by this error of publication. It is not within the province of this court to challenge the judgment of an administrative board in its proceedings as to whether a public notice required of it, as in this case, had been sufficiently served.

■■ The Congress had a right to impose conditions upon its agencies in carrying out its administrative policies, and, in the absence of the forfeiture or sacrifice of existing rights, the courts could not intervene. Moreover, the Water Power Commission, if constitutionally empowered, could have granted a permit over the protest of each and every one of the interested parties, and from such action there could have been no appeal. An owner of land or other property has no right to a judicial hearing on the necessity and expediency of a public improvement which will result in the taking of his land. He has no constitutional right to notice of the proceeding in which it is decided to construct the improvement nor as to its location.

7. Upon the evidence in this case, it must be held that the Congress had authority in respect of the proposed enterprise, and that its administrative agency has proceeded regularly. The Federal Power Commission granted its preliminary permit, and thereafter a license, as contemplated by the Federal Water Power Act. It did this after a survey of the proposal and the submission by its permittee of maps and plans which tended to acquaint said commission with the exact nature of the undertaking and the magnitude thereof. Its license was not granted until its inquiries had been satisfied.

- The data furnished the Commission undoubtedly enabled it to understand the interests to be affected by the proposed improvement. The Congress contemplated these identical problems when it established such commission and provided for the data and information to be furnished it. Provision was even made for hearings by the taking of depositions, the summoning of witnesses, the production of documentary evidence, the administration of oaths, and fees and mileage for witnesses. Undoubtedly the object of these delegated powers was to enable the Commission to consider the effect of such improvement upon the state and municipalities within the reservoirs created by the construction of dams across navigable streams. The Congress must have contemplated that, not only would private properties be affected, but that public properties would in like manner be damaged by the proposed improvements. That doubtless was the reason why Congress provided for extensive preliminary inquiries and for notice to the state and municipalities affected. This leads us to the question as to how extensively the right of eminent domain could be exercised by the corporation making the improvement.

8. By section 21 of the Water Power Act (16 USCA § 814) it is expressly provided that: "When any licensee can not acquire by contract or pledges an unimproved dam site or the right to use or damage the lands or property of others necessary to the construction, maintenance, or operation of any dam, reservoir, diversion structure, or the works appurtenant or accessory thereto, in conjunction with an improvement which in the judgment of the commission is desirable and justified in the public interest for the purpose of improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, it may acquire the same

by the exercise of the right of eminent domain in the district court of the United States for the district in which such land or other property may be located, or in the State courts."

The licensee has been granted the power to acquire property by the exercise of eminent domain in express terms. Concededly this right may be exercised as against private property.

"Public lands," as used in the act, refers only to lands owned by the United States. The only question, therefore, that is here presented is whether the right of eminent domain may be exercised against property already dedicated to a public use when situated within the proposed reservoir and to be affected by the improvement.

■■■■ 9. While it is well settled that the Legislature may authorize the taking of property already devoted to a public use, it is equally well established that a general delegation of the power of eminent domain does not authorize the taking of property already devoted to a public use, *"unless it can clearly be inferred from the nature of the improvements authorized or from the impracticability of constructing them without encroaching upon such property that the legislature intended to authorize such a taking."* 10 R. C. L. § 169; Western Union Telegraph Co. v. Pennsylvania R. R. Co. et al., 195 U. S. 540, 25 S. Ct. 133, 49 L. Ed. 312, 1 Ann. Cas. 517. In this connection it cannot be questioned but that the Congress had the power to confer the right of eminent domain upon the defendant Union Electric Light & Power Company. 10 R. C. L. § 167.

■■■■ In the instant case the Congress must have contemplated this identical situation; hence the requirement of notice. Moreover, the proposed improvements could not be accomplished, except through the exercise, if necessary, of eminent domain against property already dedicated to public use. To deny the right of eminent domain as against this public property would not only defeat the functions of the national government, but would run contrary to the obvious intent of the Congress as expressed in the Water Power Act. Stockton, Attorney General, v. Baltimore & New York R. R. Co. (C. C.) 32 F. 9; 20 C. J. § 90, P. 602; Vermont Hydro-Electric Corporation v. Dunn et al., 95 Vt. 144, 112 A. 223, 12 A. L. R. 1495; Imperial Irrigation Co. v. Jayne, 104 Tex. 395, 138 S. W. 575, Ann. Cas. 1914B, 322.

■■■■ It is not within the judicial power to question the purpose for which **property** is to be taken under the power of eminent domain. The necessity for the taking is not a judicial question, but is exclusively within the power of Congress and one which it may determine by direct enactment or by delegating the power to some officer or board. Kaw Valley Drainage District of Wyandotte County, Kansas, et al. v. Metropolitan Water Co. (C. C. A.) 186 F. 315.

■■■■ 10. In view of the foregoing, it is not necessary for the court to pass on the question as to whether the creation of a lake, as the result of the construction of the dam, would occasion an unsanitary and unhealthful condition in the community. The court would be without authority to interfere with the governmental function upon this ground. However, the Federal Power Commission has made provision in its license for this contingency. Moreover, the evidence did not support the allegations of complainants' bill that the project would result in a deleterious and harmful condition. On the contrary, it is easily deducible from the testimony that a more healthful condition would be created than that which prevails at the present time.

■■■■ 11. An issue has been raised as to the effect of the proposed improvements on the finances of Camden county. This is a question that could not stand as a barrier against the improvement. That identical situation must have been contemplated by the Federal Power Commission, and, even if it worked disastrously to the finances of the county, the public interest, according to the Federal Power Commission, would be best served, notwithstanding such sacrifice. However, many compensating features have been suggested that would tend to increase the revenues of the county rather than reduce them.

■■■■ 12. This court can take no cognizance of the enforced removal of the county seat of Camden county. The Congress acting under its power to regulate commerce is supreme, and its authority must be upheld and executed, even though it involves the removal of the county seat of Camden county. Even a county seat could not endure as an obstruction and barrier to the free exercise of governmental authority.

■■■■ 13. Concerning the alleged conflict of laws with respect to the construction of chutes for the passage of fish, the defendant Union Electric Light & Power Company, in open court, volunteered compliance with any practical regulation that might be imposed by the proper authorities of the state of Missouri. The Missouri Laws in respect of fish and game appear to be vague on this ques-

tion. Certainly this question should not now be interposed as a barrier to such public improvements, particularly in view of the findings made by the Federal Power Commission that there had been a compliance with the laws of Missouri.

14. The evidence tended to show moreover that the defendants had contracted with the proper state and municipal authorities for damages arising from encroachment upon public property. These are matters, however, to be determined upon execution of said contracts or in a proper proceeding in the exercise of eminent domain.

15. An examination of the facts in this case in the light of applicable principles of law does not disclose any reason why this court should interfere with the project. The state law is silent on the subject. The question of the removal of the county seat should not delay the governmental functions. The defendants do not ask for affirmative relief.

Accordingly, complainants' bill will be dismissed. It will be so ordered.