THE SCOW NO. 9.

THE MINOT I. WILCOX.

(District Court, D. Massachusetts. March 20, 1907.)

Nos. 1,820, 1,821.

1. NAVIGABLE WATERS—DEPOSITING REFUSE IN—LIABILITY OF VESSEL.

Act March 3, 1899, c. 425, §§ 13, 16, 30 Stat. 1152, 1153 [U. S. Comp. St. 1901, pp. 3542, 3544], prohibiting the deposit of refuse matter in any navigable water of the United States, and making any vessel used in such illegal act liable for the pecuniary penalties imposed therefor, are within the constitutional powers of Congress, and to render a vessel subject to such penalties it is not essential that some person or corporation should have previously been convicted thereunder.

2. SAME.

Where the owners of a dumping scow placed a man in sole charge with power to dump her load, and he becoming unnecessarily alarmed at the roughness of the sea while being towed to the dumping grounds dumped a part of her load into the waters of a harbor in violation of Act March 3, 1899, c. 425, § 13, 30 Stat. 1152 [U. S. Comp. St. 1901, p. 3542], the scow is subject to the penalty imposed by section 16 of the act, although the action of the scowman was contrary to the orders of the owner; but the towing tug, although the property of the same owner, where the master had no reason to anticipate the violation of the statute, cannot be said to have been "used or employed" in such violation, and is not subject to the penalty therefor.

In Admiralty.

William H. Garland, Asst. U. S. Atty.

Carver & Blodgett, for claimants.

DODGE, District Judge. The two vessels proceeded against by way of libel in these cases belonged to the same owners, who were engaged in dredging operations in Boston Harbor under contract with the United States. On November 1, 1906, the tug was engaged in towing the scow, which had on board a load consisting of refuse material brought up from the bottom in the course of the dredging work, toward a place outside the harbor where it is contended that dumping had been duly permitted by the War Department, according to Act March 3, 1899, c. 425, § 13, 30 Stat. 1152 [U. S. Comp. St. 1901, p. 3542]. A part of the scow's load was dumped before the intended destination was reached, within the harbor, at a place where dumping had never been permitted, and where it was unlawful under the act referred to. This happened while the scow was being towed by the tug. The above facts are not disputed, and the government contends that by reason of them, both vessels, the tug as well as the scow, have become liable for the pecuniary penalties established by section 16 of the act, because both have been "used or employed in violating" the provisions of section 13 against discharging such material into navigable water of the United States.

The owners of the tug and scow have appeared as claimants in each case and have excepted to each libel, alleging as reasons why the proceedings cannot be maintained that a vessel can be held liable under the act only when some person or corporation has first been

convicted of a violation of its provisions, whereas in neither of these suits does the government allege any such previous conviction; also that the act itself is one which Congress had no power to pass, and which in various respects specified violates the provisions of the Constitution, or of the fourth, fifth, and sixth amendments thereof. I find it impossible in view of the decision of the Court of Appeals for this circuit in New England Dredging Co. v. United States, 144 Fed. 932, 75 C. C. A. 572, to sustain the construction of the statute for which the claimants contend, or to allow any weight to the constitutional objections which they raise. All the exceptions were overruled, as were also motions filed by the claimants for jury trial. The proceedings against vessels for which the statute provides are proceedings in admiralty, and they are to be conducted in all respects as other proceedings in admiralty are conducted. Upon answers to the libels filed by the claimants without waiving their exceptions, there has now been a hearing before the court.

The evidence at the trial showed that the scow had one man only on board, and that the discharge of part of her load which is complained of was by his voluntary act, without orders from the owners or from the captain of the tugboat, and contrary to general instructions given him not to discharge without orders. In these respects the case is like New England Dredging Co. v. United States above referred to. In that case there was no evidence as to the motive for the scowman's act. In this case the evidence tended to show his motive to have been an apprehension that the scow would sink under him unless relieved of part of her load.

The scow had six pockets arranged for the carriage and dumping of mud. Her capacity when all were fully loaded was 747 cubic yards. She had on board at the time 517 yards in all. One of her pockets (No. 2) was empty. All the others were partly loaded, though none of them was loaded to its full capacity. She had been thus loaded on October 30th, and left at her mooring in the upper harbor to wait for the tug to take her to the dumping ground. The wind on October 31st was strong northeast, and it was too rough to go out. During the following night the direction of the wind changed to north and northwest and it lessened in force. About 4 o'clock in the morning of November 1st the tugboat went to the mooring, took the scow in tow, and started for the dumping ground, after putting the scowman on board her. Within the harbor, where the mooring was, there was no rough water, and in the judgment of the captain of the tug it was suitable to "go down to the outside to see whether it was too rough or not" to proceed further. The scow had been previously used in transporting dredged mud to the dumping ground, and had always been found, so far as appeared, a proper and sufficient vessel for the purpose. As she had been loaded on this occasion, she was higher out of water by a foot or more than she would have been with a full load. At a point a little inside No. 4 buoy, in what is known as the slough in Ram Head Channel, heavy seas were for the first time encountered, so heavy as to convince the captain of the tugboat that it would be too rough further out for the scow and for the tugboat as well. He therefore turned the tugboat around, in-

tending to take the scow back to the mooring. While the scow was turning and was in the trough of the sea several waves washed over her deck, the scowman became frightened, and in the fear that she would go under and he would be drowned he emptied two of the pockets by operating the mechanism which opened them at the bottom. The pockets emptied contained 196 cubic yards in all. Relieved of this portion of her load, the scow rode considerably higher out of water than before, and no more waves washed over her. The scowman opened the pockets wholly upon his own responsibility, and without any previous intimation that he intended to do so, or that he apprehended any danger. His instructions were not to dump without signal from the tug, unless to save life or property.

Proof that the scowman's act in thus emptying the pockets was really compelled by an emergency which made it necessary to open them in order to save life or property would raise the question how far such an emergency could prevent his act from being regarded as a violation of the statute, and for the purposes of this question it might be important to inquire whether or not the scow had been properly loaded and adequately equipped in every respect for all such emergencies as she might be expected to encounter, and whether or not the master of the tugboat had exercised proper care to avoid exposing her to seas so rough as to endanger her. I do not find it necessary to consider any of these questions. The scowman testified in person before me, as did all the other witnesses in the case. The evidence does not satisfy me that there was any danger to life or property which justified him in opening the pockets without orders from the tugboat, or that he had reasonable ground to apprehend such danger. I find that he was unnecessarily alarmed, and that the rough water into which the scow was brought while turning neither excused the dumping of the contents of the pockets nor required the captain of the tugboat to anticipate that they might have to be dumped for the safety of the scow.

This conclusion, however, cannot save the scow from the statutory penalty. Her owners left the discharge of her load within the sole power of this scowman. The scow was "used" by him in a violation of the act. Such "use" was within the scope of his employment. She is therefore liable under section 16. This is settled by New England Dredging Co. v. United States, 144 Fed. 932, 75 C. C. A. 572, already cited.

If the unlawful act of the scowman could be ascribed to any design or neglect on the part of the owners of both craft, or on the part of the captain of the tugboat, the tugboat as well as the scow might properly be held to have been "used" in the violation of the statute which was committed. As the case stands, I do not think I am required to construe the language of the statute so broadly as to include the tugboat. There was no violation of the statute on board her, or by any person to whom the owners had entrusted any duty on board her. All that can be said is that she was being used and employed in towing the scow at the time the man in charge of the scow unexpectedly made use of that vessel in a violation of the act. The act does not impose a penalty upon every vessel engaged in the transportation

of material dumped in violation of law, as Rev. St. § 3062 [U. S. Comp. St. 1901, p. 2007], subjects to forfeiture every team or other motive power used in drawing or propelling a vehicle containing smuggled goods. Act June 29, 1888, c. 496, 25 Stat. 209 [U. S. Comp. St. 1901, p. 3533], for the prevention of dumping in New York harbor, contained provisions similar in character to those of the act under which these proceedings are brought, and imposed penalties in like manner upon vessels used or employed in its violation. Under this act it was held that a tug was not "used or employed" in the illegal act of scowmen, who without the knowledge of those on the tug dumped the contents of a scow she was towing at a forbidden place. The Emperor (D. C.) 49 Fed. 751. The act of June 29, 1888, was amended in 1894, after the decision referred to, and as amended it makes the persons in charge of a tugboat towing a scow liable to equal punishment with the persons in charge of the scow for any illegal dumping. These provisions, it has been held, subject all the persons assisting in the general undertaking in the course of which the forbidden act is done to the penalties of the statute. Jaycox v. United States, 107 Fed. 938, 47 C. C. A. 83. But no such provisions are contained in the statute with which we are here concerned.

The penalty incurred by the scow is fixed at $500, for which amount a decree is to be entered in the proceeding against her. The libel against the tugboat is to be dismissed.