### RYAN et al. v. CHICAGO, B. & Q. R. CO.

### No. 4748.

Circuit Court of Appeals, Seventh Circuit.
June 11, 1932.

This action was instituted by appellee, in which it sought to restrain an alleged unauthorized exercise of power by the Secretary of War and his subordinates and attorneys who are named as appellants.

The trial court found the facts specially and rendered conclusions of law thereon; and, with the exception of that part of finding No. 1 which deals with jurisdiction and venue, they are set forth in the margin.[1]

---

[1] 1. (b) Plaintiff claims that defendants, officers of the United States, are proceeding to build a dam which will deprive plaintiff of its property without due process of law and without just compensation, in violation of plaintiff's rights under the Fifth Amendment; that defendants are proceeding to damage and destroy plaintiff's property under pretended authority of the Act of Congress of July 3, 1930, but contrary to and in disregard thereof; and that defendants are without authority, under the Act of April 24, 1888, to proceed with a condemnation suit instituted in this Court; and

(c) The acts of the defendants in threatening to proceed, and in proceeding, with the construction of the dam they intend to build, and in proceeding with the condemnation suit in this Court to acquire part of plaintiff's property for construction of part of said dam, interfere with the plaintiff's unrestricted use, possession, enjoyment and disposition of its railroad and property appurtenant thereto in the Western District of Wisconsin.

2. Plaintiff owns and operates a line of double track railroad extending from Chicago, Illinois, to Minneapolis, Minnesota, along the easterly shore of the Mississippi River through the State of Wisconsin. Approximately thirty-five miles of this line between Alma and Bay City is situated in the counties of Buffalo, Pepin and Pierce, in the Western District of Wisconsin. Plaintiff owns the land constituting the right of way on which said railroad is situated, and diverse lots and parcels of land connected therewith. The location of said railroad is shown in Exhibit "C" and the location of said railroad, right of way, lots and parcels of land is shown in Exhibits "D" to "K" inclusive. The tracks in question are part of a through transcontinental line and a large number of trains carrying freight, passengers, express and United States mail are operated over said line daily in both directions. The approximate cost of the thirty-five miles of railroad between Alma and Bay City exceeded $5,000,000.

Between Alma and Bay City the tracks are close to the east shore line of the river but at all points are well above ordinary high water. The tracks, embankment, bridges, culverts and other facilities are adapted to the natural level, width, and flow of the river and its tributaries, and safe and successful use of the railroad facilities as they now exist is dependent upon maintenance of the natural level, width, and flow of the river and its tributaries in their natural channels and beds.

3. (a) Defendants are proceeding with the construction of, and intend to construct, a dam across the Mississippi River at Alma, Wisconsin, for the purpose of obstructing the natural flow of the river and artifically raising the water thereof above ordinary high water to provide a lake or pool for improvement of navigation. The condemnation suit (No. 3683 at Law), in this court was instituted by defendants to obtain property upon which to build the easterly abutment and lock of the dam.

(b) Defendants at and prior to the filing of the bill herein purposed and intended to build said dam to maintain a pool elevation higher than 665.7 feet above mean sea level, and specifically to build a dam to a crest elevation of 670 feet above mean sea level and with a capacity to impound the water to a pool elevation of such latter height. Also, defend-

Upon the findings of fact and the conclusions of law the court decreed as follows:

"1. The preliminary injunction entered in this cause on the 21st day of November, 1931, be and the same is hereby made permanent and perpetual against said defendants.

"2. Defendants, and each of them, and their agents and attorneys, and all persons acting under their direction, are further permanently restrained and enjoined from each and all of the following acts and from doing any act or thing in furtherance thereof:

First, from further prosecution of the condemnation suit, No. 3683, at law, now pending in this court to condemn a site for a lock and dam in the Mississippi River at Alma, Wisconsin, having a crest elevation of 670 feet above mean sea level or capable of impounding water to that elevation; second, from constructing a non-navigable type of lock and dam, at said place, with a crest elevation of 670 feet above mean sea level or capable of impounding water to that elevation; and, third, from condemning a site for

ants conceded that they intend to build a fixed or non-navigable type of dam, with Taintor and roller gates, as distinguished from a removable or navigable type of dam with Chanoine or Boule wickets, and that the estimated cost of the dam they intend to build is approximately $3,800,000.00.

4. Defendants do not intend to construct any levees, embankments or other protective works along the banks of the river to confine the water of the pool created by the dam, but such water will permanently overflow and flood a large area of valley lands on either side of the river lying below the contour level of the pool and it is the purpose of defendants to create and permanently maintain an artificial lake or pool extending up the river, the width of the pool depending upon the height of it. Exhibit "B" shows the extent to which a pool level of 670 feet would widen the river and overflow property for the first fourteen miles above the dam. A pool level of 670 feet would impound the water at Alma approximately 20 feet higher than the river bed, 14 feet above the low water mark of 1864, and 8 feet above ordinary high water, which is approximately 662.1. The lower mitre sill of the lock of the Hastings Dam is 660.1. Unless and until defendants construct another dam (No. 3) between Alma and Hastings, a pool level of 670 at the Alma Dam would extend upstream a distance of 61.95 miles to Hastings and provide almost 10 feet of water over the lower mitre sill of the Hastings lock. It would provide a 14 foot channel above low water of 1864 at Alma.

5. (a) The elevation of the top of the tie of plaintiff's track at Alma is 673.5 feet. The ballast is of an average depth of 18 inches and the so-called subgrade, or the top of the embankment, at an elevation of 672 feet, 10 feet above ordinary high water. Between Alma and Bay City the elevation of plaintiff's track (top of tie) varies with the contour of the land and the necessary elevation of bridges and culverts, from 673.5 to 685 feet. Water impounded by the dam to an elevation of 670 feet at Alma would stand against plaintiff's railroad embankment practically all the distance between Alma and Bay City, in many places on both sides of the tracks. The maximum height of the water thus impounded would be increased above 670 feet upstream from the dam because of so-called "swell-head" or increased height of water due to the fixed parts of the dam. Plaintiff's tracks are constructed upon embankments consisting largely of earth and sand. The water of a pool at an elevation of 670 feet, impounded against the embankment, would saturate it above the water line due to capillary attraction. Wind sweeping over the pool would create wave action causing the water of the pool to wash, erode and saturate the embankment above the elevation of 670, and, in the winter season, heavy ice, forming on the pool, would seriously damage the embankment and tracks.

(b) Plaintiff has 15 bridges and 15 culverts, established to provide side drainage, which would be below or so close to the level of the water impounded to 670 feet that they would be rendered ineffective and substantially the entire 35 miles of the railroad from Alma to Bay City, including the embankment, right of way, track and all facilities connected therewith, would be permanently flooded, invaded, saturated and eroded by the water of a pool 670 feet high, and thereby the railroad would be rendered unsafe and its use effectually and permanently impaired and destroyed.

(c) Plaintiff's witnesses estimated that the cost of rebuilding its embankment, tracks, bridges and facilities so as to accommodate them to a pool level of 670 feet would be $454,000, and defendants admitted that they had estimated the damages to riparian property from a pool elevation of 670 feet at $1,569,000, which estimate included damage to plaintiff's railroad of $253,000.

6. (a) Defendants' authority to build a dam at Alma is derived from the following provisions of the Act of Congress of July 3, 1930:

"Mississippi River between mouth of Illinois River and Minneapolis: The existing project is hereby modified so as to provide a channel depth of nine feet at low water with widths suitable for long-haul common-carrier service, to be prosecuted in accordance with the plan for a comprehensive project to procure a channel of nine-foot depth, submitted in House Document Numbered 290, Seventy-first Congress, second session; and the sum of $7,500,000 in addition to the amounts authorized under existing projects, is hereby authorized to be appropriated for the prosecution of initial works under the modified project: Provided, That all locks below the Twin City Dam shall be of not less than the Ohio River standard dimensions."

(b) The "plan for a comprehensive project to procure a channel of 9-foot depth submitted in House Document Numbered 290, 71st Congress, Second Session" is set forth in paragraphs 601 and 602, pages 46 and 47 of said House Document 290, as follows:

"Recommended plan—First Step.—In 'Section V above the board has outlined its' plan for a comprehensive project to procure a channel of 9-foot depth attractive to economical modern navigation. Under the present project there are reaches wherein the regulation works to secure a 6-foot depth at low water have proven unsuccessful. In addition there are locations such as at Moline Lock and the Rock Island rapids which seriously impede present commercial practice on any draft. In view of these facts it is the intent of the board to recommend that as a first step the present project be modified, in the belief that radical modifications similar to those recommended at critical points will be necessary to provide a good through 6-foot channel regardless of the contemporary investigation on the possibility of obtaining a depth of 9 feet. The new works recommended will be so located and designed, however, that they will be fully capable of being introduced as component parts without major alterations into a comprehensive plan for attaining a 9-foot depth for the entire river. The locks and dams recommended will give a 9-foot channel only through the pools so created. These pools will, however, embrace reaches on the river in which channel conditions are now most severe and in which a 6-foot channel may never be attained by present methods. On the other hand, the remaining reaches of the river, those upon which channel con-

or constructing at said place, any lock and dam having a crest elevation in excess of 665.7 feet above mean sea level or capable of impounding water above that elevation."

Stanley M. Ryan and Harold E. Hanson, both of Madison, Wis., for appellants.

J. W. Weingarten, of Omaha, Neb., A. C. Scott, of Denver, Colo., and J. C. James, of Chicago, Ill. (Bruce Scott, of Chicago, Ill., of counsel), for appellee.

Henry N. Benson, Atty. Gen., for Upper Mississippi and St. Croix River Improvement Commission.

George C. Lambert, of St. Paul, Minn., and A. C. Wiprud, of Minneapolis, Minn. (Mortimer H. Boutelle, Sp. Asst. Atty. Gen., of counsel), for Upper Mississippi Barge Line Co.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

---

ditions are now the best, can be so concentrated upon by present methods of dredging and maintenance that a dependable 6-foot channel will be assured throughout at low water with better ruling depths at higher stages available during the spring and usually in the late fall."

Table 601.—First Step.

| Item | Mile | Estimated Cost |
|---|---|---|
| Dredging in Twin City Pool... | 11. 2—6 2A | $ 92,000 |
| Dredging at head of pool 2..... | 0 | 266,000 |
| Lock and Dam No. 4.......... | 85.4 | 2,944,000 |
| Lock and Dam No. 5.......... | 105.6 | 3,088,000 |
| Lock and Dam No. 6.......... | 125.1 | 2,361,000 |
| Lock and Dam No. 7.......... | 140.4 | 3,327,000 |
| Lock and Dam No. 8.......... | 161.7 | 3,381,000 |
| Lock and Dam No. 9.......... | 204.5 | 3,057,000 |
| Lock and Dam No. 16 (Rock Island), including flowage damages and removal of old lock .................... | 362.4 | 6,592,000 |
| Dredging at head of Keokuk pool, including removal of standing timber.............. | 429—441 | 33,000 |
| Additional lock at Keokuk (19) | 483.4 | 1,500,000 |
| Additional lock at Twin City Dam ......................... | 6.2A | 1,200,000 |
| Regulation, Quincy to Grafton.. | 524.5—635 | 8,100,000 |
| | | $35,941,000 |
| Plus 15 per cent. for contingencies ........................ | | 5,391,000 |
| Plus flowage damages.......... | | 9,000,000 |
| Total ...................... | | $50,332,000 |

"Recommended plan, second step.—The following items represent the works necessary to complete the entire plan in addition to those enumerated above:"

Table 602.—Second Step.

| Item | Mile | Estimated Cost |
|---|---|---|
| Lock and Dam No. 3.............. | 48.0 | $ 2,769,000 |
| Lock and Dam No. 10.............. | 235.5 | 3,213,000 |
| Lock and Dam No. 11.............. | 251.25 | 3,219,000 |
| Lock and Dam No. 12.............. | 277.5 | 3,354,000 |
| Lock and Dam No. 13.............. | 311.25 | 3,637,000 |
| Lock and Dam No. 14.............. | 348.5 | 3,664,000 |
| Lock and Dam No. 16.............. | 390.25 | 3,569,000 |
| Lock and Dam No. 17.............. | 409.0 | 4,042,000 |
| Lock and Dam No. 18.............. | 435.75 | 4,466,000 |
| Lock and Dam No. 20.............. | 500.25 | 3,923,000 |
| Lock and Dam No. 21.............. | 524.5 | 3,680,000 |
| | | $39,536,000 |
| Plus 15 per cent. for contingencies | | 5,930,000 |
| Plus flowage damages............. | | 2,625,000 |
| Total ........................... | | $48,091,000 |

The particular dam involved in this case is lock and dam No. 4 referred to in Table 601 "First Step," located at Mile 85.4, estimated cost $2,944,000. The details concerning the locks and dams incorporated in "the plan for a comprehensive project" and particularly concerning lock and dam No. 4 are set out in Table 503, Scheme I, page 39 of House Doc-

ument 290 and as to Lock and Dam No. 4 are as follows: Located 85.4 miles below St. Paul; low water elevation of project 657.2 above mean sea level; pool elevation, 665.7 above mean sea level; lift, 7 feet; cost, $2,944,000. It is one of seven low dams of the movable type on pile foundations, with locks 110 by 600 feet, navigable pass of 450 feet and a weir of Chanoine or Boule type for regulating the pool and facilitating operation of the pass. Such a dam permits open river navigation during high stages of the river and offers a minimum obstruction to the passage of water during floods, because the movable parts of the dam are laid down on the bed of the stream.

The dams referred to in Scheme II of Table 503 are not included or incorporated in the "plan for a comprehensive project" submitted in House Document 290. These were fixed or non-navigable high dams, with Taintor or roller gates for spillways and would constitute permanent obstructions to the flow of water at all stages. Such dams would greatly increase the damage to riparian property by overflow as compared with the damage occasioned to similar property by the low navigable dams incorporated into the plan for a comprehensive project.

The dam defendants intend to build at Alma described in Finding of Fact No. 5 is not included, incorporated or found in the plan for a comprehensive project submitted in House Document 290.

Exhibit "L" shows the differences between the dam authorized by Congress and the dam defendants intend to build.

Defendants' engineer, who conducted the surveys and made the estimates for the cost of both the dam defendants intend to build at Alma and the dam referred to as No. 4 in Table 601, Document 290, therein estimated to cost $2,944,000, testified that the $2,944,000 dam in Table 601 was a dam with a pool level of 665.7 feet.

7. Said dam which defendants intend and threaten to build across the Mississippi River at Alma will flood, inundate and damage a vast and extensive area of lands, including railroads paralleling the river bank, on either side of the Mississippi River, whereas a dam of the navigable type, having a crest elevation and pool level of 665.7 feet above mean sea level, and costing $2,944,000, would cause a radically lesser amount of flowage damage to the aforesaid lands, and, specifically to the plaintiff herein. The differences in type, height, pool level, cost and flowage damages between the two dams are not mere differences in detail or degree, but, on the other hand, amount to radical differences in nature and kind.

Conclusions of Law.

1. This Court has jurisdiction of the subject-matter. This is a suit of a civil nature, in equity, and the matter in controversy exceeds, exclusive of interest and costs, the sum or value of $3,000. It is a suit between citizens of different states, a suit arising under the Constitution and laws of the United States, and a suit of a local nature, involving the use, possession and enjoyment of plaintiff's property situated in the Western District of Wisconsin.

The Court has jurisdiction of the parties. Personal service was had on four of the defendants, and all defendants appeared and answered, and

SPARKS, Circuit Judge (after stating the facts as above).

It is appellee's contention, and the trial court so found, that Congress had fixed the height, type, and cost of the dam to be constructed across the Mississippi river at Alma, and that it was to be a low movable dam, of navigable type, costing $2,944,000, having a lift of 7 feet, and impounding the water of the river to an elevation of 665.7 feet above mean sea level. These specifications are hereinafter referred to as plan 1.

It is appellee's further contention, and the trial court so found, that, in order to provide a water depth of 9 feet for navigation, appellants were proceeding, without authority, to build at Alma a dam of a fixed or nonnavigable type, costing $3,800,000, with a lift of 12 feet, to impound the water of the river to a pool level of 670 feet above mean sea level. These second specifications are hereinafter referred to as plan 2. Such construction, by reason of the absence of levees and embankments, would flood and damage riparian property, including that of appellee, to a much greater extent than would construction under plan 1. Appellee further contends that Congress has not authorized the construction under plan 2, and has made no appropriation out of which the cost or resulting damage of such construction can be legally paid; and that, although the United States may consent to be sued for such cost and damage, there is no liability resting upon, it

to respond in damages for the construction of any work which it has not authorized or for which it has made no appropriation. It is therefore contended by appellee that, on account of the absence of such authorization or appropriation, appellants have no right to cause the damage which will necessarily result from the construction under plan 2, nor to appropriate appellee's land sought to be appropriated for that purpose.

In argument it was frankly stated by appellee that the value of the real estate sought to be appropriated is not of great importance, and that appellee is not objecting to the appropriation of the real estate for the purpose designated provided it is done lawfully; neither is appellee objecting to the work being established as contemplated by appellants provided it is done in conformity to law, and this appellee insists upon for the sole purpose of making certain its compensation for very great damages by "flowage," which are sure to result from the construction of the work under plan 2.

Appellants contend, however, that the government has authorized the construction of the dam under plan 2, and that a valid appropriation for that purpose has been made by Congress, although not sufficient in amount to cover the entire cost and resulting damage. Their theory is that, while a dam at Alma has not specifically been referred to by *Congress, yet, by virtue of the Act of July 3, 1930, 46 Stat. 918, 927, a general project was

---

thereby waived any objection to venue or jurisdiction of their persons.

2. This is not a suit against the United States but an action seeking to restrain an unauthorized exercise of power by the Secretary of War, his subordinates and attorneys.

3. The Act of July 3, 1930, "modified * * * the existing project * * * so as to provide a channel depth of nine feet at low water with widths suitable for long-haul common-carrier service," directed that said modified project was "to be prosecuted in accordance with the plan for a comprehensive project to procure a channel of nine-foot depth, submitted in House Document Numbered 290, Seventy-first Congress, second session," and appropriated "the sum of $7,500,000 in addition to the amounts authorized under existing projects * * * for the prosecution of initial works under the modified project."

4. The "plan for a comprehensive project" submitted in House Document 290, and which said plan is incorporated in the Act of July 3, 1930, by reference, makes provisions for a series of dams to be built across the channel of the Mississippi River between the mouth of the Illinois River and Minneapolis, Minnesota, for the purpose of improving navigation and providing a nine-foot channel.

5. Said plan for a comprehensive project provides, among other things, for a dam at Alma, Wisconsin, to be known as No. 4, estimated to cost $2,944,000, exclusive of flowage damages, with a crest elevation of 665.7 feet above mean sea level datum, and a pool level of 665.7 feet above mean sea level, said dam to be of the navigable type.

6. The Secretary of War and his subordinates, de-

fendants herein, are without legal power or authority to condemn a site for, or to construct, a lock or dam at Alma, Wisconsin, of any other or different type, height or cost than that mentioned in conclusion of law No. 5, which said dam is provided for in the Act of Congress, and, specifically, they are wholly without power or authority to construct a non-navigable dam at Alma, Wisconsin, costing approximately $3,800,000 with a crest elevation and pool level of 670 feet mean sea level.

7. The Secretary of War, his subordinates and attorneys, defendants herein, have no legal power or authority to condemn or take immediate possession of a strip of plaintiff's land at Alma, Wisconsin, on which to erect the easterly abutment and lock of a non-navigable dam costing approximately $4,000,000 with a crest elevation and pool level of 670 feet mean sea level datum; nor have they any power or authority to condemn or take possession of any land whatsoever at Alma, Wisconsin, for any dam with a crest elevation in excess of 665.7 feet mean sea level, or costing in excess of approximately $2,944,000, or of the type different from the navigable dam provided for by Congress in the Act of July 3, 1930.

8. From the facts found, plaintiff is threatened with irreparable injury, is without adequate remedy at law, and is entitled to an injunction restraining defendants from constructing a dam at Alma different from that authorized by the Act of Congress, as hereinbefore found.

9. The allegations of plaintiff's bill are fully proven and true, and plaintiff is entitled to a decree conformably with the prayer.

authorized by Congress for improving the Mississippi river between the Illinois river and Minneapolis, for the purpose of improving navigation, by constructing and maintaining a 9-foot channel therein; and that, in order to accomplish that purpose, it is necessary to construct the dam at Alma according to the plans and specifications under which appellants are threatening to proceed.

■ Detailed plans and specifications for the construction of enormous works of this kind are never prepared and approved in advance by Congress, but, after authorization of the work by Congress, the plans are prepared by officers of the Board of Engineers of the United States Army under the supervision of the Secretary of War, to whom is given a very wide discretion over the construction, maintenance, and alteration of dams, bridges, and dikes in the navigable waters of the United States. 33 USCA §§ 1, 3, 401, 403. See also 33 USCA §§ 2, 27, 38, 402, as illustrative of such delegated discretion. The lodgment by Congress of such discretion in the Secretary of War and the Board of Engineers is not a delegation of legislative power, but of mere administrative detail which the law permits. Louisville Bridge Co. v. United States, 242 U. S. 409, 37 S. Ct. 158, 61 L. Ed. 395; St. Louis Cons. Coal Co. v. Illinois, 185 U. S. 203, 22 S. Ct. 616, 46 L. Ed. 812; Miller v. Mayor of New York, 109 U. S. 385, 3 S. Ct. 228, 27 L. Ed. 971; Field v. Clark, 143 U. S. 649, 12 S. Ct. 495, 36 L. Ed. 294; Wayman v. Southard, 10 Wheat. (23 U. S.) 1, 6 L. Ed. 253; State of Missouri, etc., v. Union Electric Light & Power Co. (D. C.) 42 F.(2d) 692; Delaware R. Co. v. Weeks (D. C.) 293 F. 114; Loud v. United States (C. C. A.) 286 F. 56; Alabama Power Co. v. Gulf Power Co. (D. C.) 283 F. 606; In re Condemnations for Improvement of Rouge River (D. C.) 266 F. 105; United States v. Certain Lands in Town of Narragansett (C. C.) 145 F. 654; United States v. Union Bridge Co. (D. C.) 143 F. 377; United States v. David Burns and Gideon Burns (C. C.) 54 F. 351; Hawkins Point Light-House Case (C. C.) 39 F. 77.

■ It is not contended that the Secretary of War or those acting under him can override the will of Congress. His discretion lies in working out the details which he deems necessary to carry out the project authorized by Congress; but if Congress so desires it may limit the project as to details, and, if it does so, the Secretary of War has no authority to ignore or change those details. These principles we regard as well settled, and we do not understand that appellants controvert them.

It is contended, however, by appellee that Congress, by the Act of July 3, 1930, placed a limitation upon the dam to be constructed at Alma by adopting plan 1, and for that reason appellants have no authority to substitute and adopt plan 2 without the approval of Congress.

The act last referred to does not in words mention the Alma dam, but it modifies the existing project "so as to provide a channel depth of nine feet at low water * * * to be prosecuted in accordance with the plan * * * submitted in House Document Numbered 290 * * * and the sum of $7,500,000, in addition to the amounts authorized under existing projects, is hereby authorized to be appropriated for the prosecution of initial works under the modified project: Provided, That all locks below the Twin City Dam shall be of not less than the Ohio River standard dimensions."

House Document No. 290 is a letter from the Secretary of War to the Speaker of the House of Representatives transmitting a report from the chief of engineers on a partial survey of the Mississippi river between the mouth of the Missouri river and Minneapolis, with a view to securing a channel depth of 9 feet at low water, with suitable widths. The report states that a "final report will be submitted after completion of the survey now in progress, which is expected to require about 12 months' additional time"; and the Board of Engineers recommended that final action on the case be deferred until the survey has been completed. The report further states that it is the Board's belief "that the date of completion of a 9-foot project, should one be adopted as a result of that report, would be advanced rather than delayed by a carefully worked out program of construction, which can be prepared only after complete and detailed plans are available. * * * That greater immediate benefits to navigation will result from utilizing this season in pushing the work *now authorized* on the 6-foot project."

The Board in its report considered both plans 1 and 2, together with variations of those plans. Much uncertainty was expressed as to the plans which should be ultimately adopted. It referred to one principal advantage of plan 1, in that flowage damage would be a minimum. A perusal of the entire report, however, is quite persuasive of the fact that the Board thought the height and character of the dam as specified in plan

1, which is known as a wicket type dam, and is such as are used in the Ohio river, would never accomplish the results contemplated by the statute which authorized the project. The Board, however, adopted plan 1 for a comprehensive project for estimating purposes only, but it further stated in its report that "upon receipt of more definite and complete information as a result of surveys now in progress it may prove advisable to construct fixed dams in this upper reach and no project should be adopted which will make the erection of any specified type of dams mandatory, before the accumulation of more complete data." This report was referred to the Committee on Rivers and Harbors on February 15, 1930, and the act which authorizes the project now in controversy was enacted July 3, 1930, as referred to in the trial court's findings.

Prior to November 4, 1931, appellants instituted condemnation proceedings, referred to in the statement of facts, preliminary to their proceeding to construct the proposed work under plan 2. On November 4, 1931, the instant cause was instituted by appellee, and appellants answered November 21, 1931, and the cause was submitted for trial on December 5, 1931.

On December 9, 1931, the Secretary of War transmitted to the Speaker of the House of Representatives the report of the chief of engineers, referred to as House Document No. 137, which recommends the construction of the dam at Alma under plan 2, and it was referred to the Committee on Rivers and Harbors. On January 13, 1932, before Congress had acted on the last report, the District Court entered the decree from which this appeal is taken.

The passage of the Amendatory Act of July 3, 1930, was no doubt a result of House Document No. 290, which was then before Congress, and by reason of such amendment and the appropriation therein contained the act had the effect of authorizing the project according to the plan, if any, approved or recommended in that document. No doubt such approved or recommended plan, if any, could subsequently be changed materially or even substituted by the Secretary of War with the approval of Congress; but Congress having once authorized the project, or any part thereof, to be done according to certain detailed and specified plans, we think the discretion of the Secretary of War to that extent would be limited, and any subsequent material change or substitution with respect thereto by the Secretary of War could not be said to be authorized by Congress until approved by it.

Uncertainty exists as to whether Congress intended, by its passage of the act of 1930, to adopt any detailed plan for the dam at Alma. In its report the Board of Engineers recommended that the character of the dam at Alma be not then made mandatory; but it adopted plan 1 for estimating purposes only, which plan contemplates the improvement by means of seven low movable dams, Nos. 3 to 9, inclusive, the Alma dam being No. 4. The low movable dams referred to are the kind used in the Ohio river. The report also divides the entire project into two steps, and the Alma dam is included in the first step, at an estimated cost of $2,914,000, which is the estimated cost of that dam under plan 1; and it recommends "that the works of the first step, adapted as they are to an ultimate 9-foot channel, but absolutely necessary for adequate 6-foot navigation, be authorized at once." It will also be noted that the act of 1930 provides that "all locks below the Twin City Dam shall be of not less than the Ohio River standard dimensions," which might indicate that Congress expected that type of dam to be used, which type is not contemplated in plan 2.

The least that can be said is that there is great doubt and uncertainty as to the extent of the authorization of Congress relative to the Alma dam. The damage which will necessarily result to appellee under plan 2 is so enormous that no uncertainty should be permitted to exist as to appellee's right to compensation. We are fortified in this conclusion by the fact that subsequently Congress did express itself in more certain terms. It cannot be doubted that Congress had the power to reject the report, but it did not, and the trial court, at the time the decree was entered, could not know what Congress would do; for the last time the project was under consideration by Congress the Board of Engineers would not approve plan 2 and advised Congress not to do so.

On February 24, 1932, the following act was passed by Congress:

"*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That the provision, relating to the Mississippi River between the mouth of the Illinois River and Minneapolis, in section 1 of the Act entitled 'An Act authorizing the construction, repair, and preservation of certain public works on

rivers and harbors, and for other purposes,' approved July 3, 1930, is hereby amended to read as follows:

"'Mississippi River between mouth of Illinois River and Minneapolis: The existing project is hereby modified so as to provide a channel depth of nine feet at low water with widths suitable for long-haul common-carrier service, to be prosecuted in accordance with the plan for a comprehensive project to procure a channel of nine-foot depth, submitted in House Document Numbered 290, Seventy-first Congress, second session, *or such modification thereof as in the discretion of the Chief of Engineers may be advisable;* and the sum of $7,500,000, in addition to the amounts authorized under existing projects, is hereby authorized to be appropriated for the prosecution of initial works under the modified project: *Provided,* That all locks below the Twin City Dam shall be of not less than the Ohio River standard dimensions.'"

■ The only amendment to the act of July 3, 1930, is the addition of the italicized part of the sentence in the second paragraph. It will be presumed that Congress, in enacting this amendment, had in mind all the information set forth in House Documents numbered 290 and 137, and we think there can be no doubt that it intended to, and did, by the last amendment referred to, authorize the construction of the Alma dam according to plan 2. Gibson v. United States, 166 U. S. 269, 17 S. Ct. 578, 41 L. Ed. 996; Wisconsin v. Duluth, 96 U. S. 379, 24 L. Ed. 668; South Carolina v. Georgia et al., 93 U. S. 4, 23 L. Ed. 782; Greenleaf Johnson Lumber Co. v. United States (D. C.) 204 F. 489; Miller v. Mayor of New York, supra.

It is contended by appellee, however, that the word "modification," as used in the enactment, does not warrant the substitution of an entirely different dam from the one contemplated by plan 1. Of course the word "modification" is a relative term, and must be interpreted in relation to the subject-matter with which it is used. It will be noted that the power to modify relates to the general project and is not limited to the dam, for the dam is not mentioned in the enactment. If applied to the dam, plan 2 very properly might be considered a substitution of plan 1 rather than modification of it; but, when applied to the general project, we are convinced that plan 2 is merely a modification in detail of the general project, and was so intended by Congress.

■ Appellee insists that under the act of July 3, 1930, and the act of February 24, 1932, appellants' authority to prosecute the plan for a comprehensive project is limited to expenditure of the money appropriated, citing Rev. St. § 3733, 41 USCA § 12; 34 Stat. 255, 41 USCA § 11; 34 Stat. 764, 31 USCA § 627; Goodyear Tire & Rubber Co. v. United States, 276 U. S. 287, 48 S. Ct. 306, 72 L. Ed. 575; Leiter v. United States, 271 U. S. 204, 46 S. Ct. 477, 70 L. Ed. 906; Sutton v. United States, 256 U. S. 575, 41 S. Ct. 563, 65 L. Ed. 1099, 19 A. L. R. 403. The statutes referred to and the decisions interpreting them relate to contracts and are not applicable.

■ Where an appropriation is made for a general plan or project, the appropriation bill is sufficient authority for the prosecution of that work under the supervision and superintendence of that officer of the United States having charge of the particular matter, and the appropriation is not required to be made for the entire amount before the project is begun. South Carolina v. Georgia et al., supra; Wisconsin v. Duluth, supra; Miller v. Mayor of New York, supra; Gibson v. United States, supra; Greenleaf Johnson Lumber Co. v. United States, supra. We know of no authority requiring damages to be paid by the government as a condition precedent to its proceeding with the construction of such a project as is contemplated in the instant case.

Appellants further contend that parts of findings Nos. 2, 5, 6, and 7 are unsupported by substantial evidence. There is no merit in this contention, as the bill fully alleges all the facts found, and to a large extent they are undenied by the answer. Whether appellants were harmed in being misled by the colloquy ensuing between the court and the attorneys relative to an extended hearing is a question not presented by this record.

■ It is also contended by appellants that the court erred in overruling their motion to dismiss the bill because the government had not consented to be sued, and because the bill disclosed no ground for equitable relief. We think the court very properly found that this is not a suit against the United States, but is a suit against her agents, who appellee claims are exceeding the authority granted by their principal, and that, if they are permitted so to continue, irreparable damage to appellee will result. Philadelphia Company v. Stimson, Secretary of War, 223 U. S. 605, 32 S. Ct. 340, 56 L. Ed. 570. Inasmuch as the government cannot be held liable for the acts of its agents committed in excess of their authority, appellee would be remediless at law

for damages resulting from such unauthorized acts. In view of our holding that, prior to the act of February 24, 1932, appellants were threatening to act in excess of their authority, we think the allegations of the bill were sufficient to warrant the interference of equity. Osborne v. Missouri Pacific R. Co., 147 U. S. 248, 13 S. Ct. 299, 37 L. Ed. 155; Bass v. Metropolitan West Side El. R. Co. (C. C. A.) 82 F. 857, 39 L. R. A. 711; Payne v. Kansas & A. V. R. Co. (C. C.) 46 F. 546.

We are convinced that under the facts as they existed at the time of the decree the court was warranted in granting the injunction; but we are further convinced that the act of February 24, 1932, fully authorized appellants to proceed with the project as contemplated, and the cause is now remanded with direction to dissolve the injunction.