## THE BARBARA CATES.

## CHRISTENSON S. S. CO. v. UNITED STATES.

### No. 9.

District Court, E. D. Pennsylvania.

July 23, 1936.

caused by the vessel running into a dike, constructed at government expense in the Delaware river and known as the Pea Patch Island dike. The libel avers that the cause of action is within the admiralty jurisdiction of the court; also that the respondent is further liable under sections 14 and 16 of the Act of March 3, 1899, as amended, 33 U.S.C. §§ 408 and 412 (33 U.S.C.A. §§ 408, 412). The prayer is for process "according to the course and practice of this Honorable Court in causes of admiralty and maritime jurisdiction, and/or as provided by said provisions of the Act of March 3, 1899. * * *"

I. Exceptions to the libel were filed upon the ground that its subject matter was not within the admiralty jurisdiction of the court. They were overruled without prejudice and the question reserved for further ruling. The Barbara Cates (D.C.) 8 F. Supp. 470. The plea of lack of jurisdiction was renewed in the answer filed in behalf of the Barbara Cates, without prejudice to its original exceptions. Subsequently a cross-libel was filed by the owners against the United States for damage to the ship.

At the beginning of the hearing the question of jurisdiction was again raised. At that time I was of the opinion that admiralty jurisdiction was wanting, but that the averments of such jurisdiction could be treated as surplusage and that the proceeding could be treated as a libel on the law side of the court under section 16 of the Act (33 U.S. C.A. § 412). What was said was, "I will take that position provisionally at the present time." Testimony was taken, and the matter is now before the court for disposition.

■ After a careful reconsideration of the question, I have now come to the conclusion that the cause is within the admiralty jurisdiction of the court, and so hold.

■ If this were simply a case of maritime tort, I would have little doubt that admiralty jurisdiction was wanting. In spite of the small opening in it (less than 100 feet in some 19,000), the dike was unquestionably an extension of Pea Patch Island and as such part of the land. While in a remote sense it was an aid to navigation, it was not the kind of direct aid (beacons, piles for anchorage, etc.) which the Supreme Court has recognized as giving rise to exceptions to the general rule that collisions between moving vessels and structures grounded on the bottom are not within admiralty jurisdiction. "The mere fact that its [the dike's]

Charles D. McAvoy, U. S. Dist. Atty., of Philadelphia, Pa.

Joseph W. Henderson, of Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

The United States filed this libel against the steamship Barbara Cates for damages

presence may affect the flow of the water and thereby ultimately facilitate navigation is not enough to bring the injury within the admiralty jurisdiction." The Panoil, 266 U.S. 433, 45 S.Ct. 164, 165, 69 L.Ed. 366.

But this action is an in rem proceeding for a penalty. Section 14 of the Act of March 3, 1899 (33 U.S.C. § 408 [33 U.S.C.A. § 408]), provides that it shall be unlawful to injure any dike built by the United States. Section 16 (33 U.S.C. § 412 [33 U.S.C.A. § 412]) imposes certain penalties upon any vessel used in violation of any provision of section 14. The penalties are specified. They are: (1) "The pecuniary penalties specified in the preceding section" (these penalties are fines and imprisonment); and (2) "in addition thereto * * * the amount of the damages done by said * * * vessel." If nothing beyond a tort liability had been contemplated, the added clause by which the vessel is made to respond in damages would have been wholly unnecessary, because that remedy already existed under general admiralty law, and Congress had no power to extend it to tort cases beyond admiralty jurisdiction.

In actions for fines and penalties for violations of revenue, navigation, and similar laws, admiralty jurisdiction has been universally recognized. It is derived from the subject matter, and is limited only by the requirement that the seizure be in navigable waters and not on land. "It is the place of seizure, and not the place of committing the offence, which decides the jurisdiction." Marshall, C. J., in U. S. v. The Betsy & Charlotte, 4 Cranch, 443, 452, 2 L.Ed. 673.

In The Scow 6 S, 250 U.S. 269, 39 S.Ct. 452, 63 L.Ed. 977, the question of admiralty jurisdiction was directly involved, and the jurisdiction was upheld. That was a proceeding for violating an act prohibiting illegal dumping in New York Harbor. The action was in admiralty. In the court below (D.C.) 247 F. 348, 349, Judge Hand began by saying: "The jurisdiction of this court depends upon the following language of section 4 of the act of June 29, 1888 (Comp.St.1916, § 9937 [33 U.S.C.A. § 450]): 'Any boat or vessel used or employed in violating any provision of this act, shall be liable to the pecuniary penalties imposed thereby, and may be proceeded against, summarily by way of libel in any district court.'" The Supreme Court states that "appellant * * * denied the jurisdiction of the court to entertain the suit." In upholding the jurisdiction the Supreme Court said: "The act of Congress here in question imposes a direct liability upon the vessel for the pecuniary penalties prescribed, and declares that it may be proceeded against summarily by libel in any District Court of the United States having jurisdiction thereof. * * * It treats the offending vessel as a guilty thing, upon the familiar principle of the maritime law, and permits a proceeding against her in any court of admiralty 'having jurisdiction thereof'—meaning any court within whose jurisdiction she may be found. Libels of this character, without previous conviction of the responsible persons, have been entertained under this act from the time of its enactment, and dealt with upon the merits, without question as to the jurisdiction until now. * * * If it be not a proceeding for enforcement of a penalty or forfeiture incurred under a law of the United States within the meaning of the ninth subdivision of section 24, Judicial Code [28 U.S.C.A. § 4169], the act of 1888 itself confers jurisdiction."

In The Scow No. 9 (D.C.) 152 F. 548, 549, in a similar case, the court said: "The proceedings against vessels for which the statute provides are proceedings in admiralty, and they are to be conducted in all respects as other proceedings in admiralty are conducted." To the same effect is The Scow No. 36 (C.C.A.) 144 F. 932.

It will be noted that the two cases last cited (the first in the District Court of Massachusetts and the other in the Circuit Court of Appeals for the First Circuit) were proceedings under section 16 of the Act of March 3, 1899 (33 U.S.C.A. §§ 411, 412), the same section of the statute under which the libel in the present case has been filed. The violation, of course, was of section 13 (33 U.S.C.A. § 407) prohibiting dumping, instead of section 14 (33 U.S.C.A. § 408) prohibiting damaging government structures. However, the point throughout them all is that the quasi criminal laws passed by Congress to regulate the behavior of vessels in navigable waters or to improve navigation and protect harbor facilities may be enforced by the courts of admiralty.

The conclusion here reached is certainly in conflict with some of the language used in Aktieselskabet Dampskib Gansfjord v. U. S. (The Gansfjord), 32 F.(2d) 236 (C.C.A.). The court said: "The injury alleged being to a structure which is to be regarded as land was not cognizable in a court

of admiralty." But it is very important to understand just what was really decided in that case. The cause of action was the same as that in the present case. The libel was filed on the law side of the court. The Circuit Court said: "The libel did not purport to be one in admiralty." Exceptions to the jurisdiction of the court either as a court of admiralty or as a court of law were filed, and overruled by the District Court (25 F.(2d) 736, 737), which held that the libel was a proceeding sui generis in character, and that, although it was not strictly within the admiralty jurisdiction, Congress had the right, under its broad powers to regulate commerce, to prescribe procedural forms for the enforcement of remedial legislation and that "the seeming confusion of admiralty process for the enforcement of a declared lien with the legal form of attachment" was within its authority. The holding of the District Court, 25 F.(2d) 736, was that, though the action had been brought at law, admiralty procedure was allowable, and the Circuit Court of Appeals affirmed the decree.

■ In view of the question before it, I regard what the Circuit Court of Appeals said in the Gansfjord Case as dictum, and it seems to me so directly contrary to the long-settled principles upon which jurisdiction in case of proceedings against vessels for fines, penalties, and forfeitures rest that I am compelled to differ with it. I agree with the statement of the District Court in the Gansfjord Case, 17 F.(2d) 613, 614, that the Act of March 3, 1899 (33 U.S.C.A. §§ 408, 411, 412) belongs to "the category of those quasi criminal statutes which provide for the imposition of fines, penalties, and forfeitures" and that the unliquidated damages were intended as additional penalties imposed upon the vessel as the offending thing.

■■ II. The practical importance of the question was not great either in the Gansfjord Case or in this one. In that case jury trial had been waived by stipulation. In the present case, even if the libel could be treated as on the law side, I think the claimant would have also clearly waived his right to jury trial. See Prince Line v. American Paper Exports, Inc. (C.C.A.) 55 F.(2d) 1053, 1057. The court in dealing with a very similar situation there said: "To be sure, it did not definitely appear at the outset on just what the libellant was relying; it is fair to construe the libel as possibly sounding in contract alone. But it became abun-

dantly plain as the cause proceeded that the pleading spoke with two voices, and meant to rely upon the Shipping Act (46 U.S.C.A. § 814 et seq.), if a contract to carry at the established rates was not proved. The respondent was bound at that time to claim its right to a jury, if it meant to insist upon it; for a jury trial is not in civil cases a constitutional necessity; a defendant may lose it by inaction."

Nor would there be any subsequent difference in the two modes of procedure with regard to the counterclaim. I am satisfied that under the principles of The Thekla, 266 U.S. 328, 45 S.Ct. 112, 69 L.Ed. 313, the counterclaim or cross-action could be maintained either at law or in admiralty. Nassau Smelting & Refining Works v. United States, 266 U.S. 101, 45 S.Ct. 25, 69 L.Ed. 190, cited by the libelant to the contrary, is not in point. The reason that the counterclaim was denied in that case was that it depended upon the Dent Act (50 U.S.C.A. § 80 note) under which Congress had confirmed jurisdiction to the Court of Claims exclusively; hence it could not be asserted in the District Court. There is nothing to limit the broad principles of The Thekla to admiralty cases only.

■ III. The principal question of law involved is whether or not the damaged dike was constructed with the consent of Congress. If it was not authorized, then it might be considered as a nuisance and no recovery had for injury to it. In addition the whole jurisdiction under the act of 1899 might be ousted since that act applies only to works built by the United States.

United States v. Arizona, 295 U.S. 174, 55 S.Ct. 666, 79 L.Ed. 1371, affects this case no further than to hold that the regulatory and disciplinary statute forbidding obstruction of navigable waters applies to the Secretary of War and other government officers as well as to other individuals. There was clearly a total lack of authorization in that case.

In the present case, however, I am satisfied that the Pea Patch Island dike was built with the consent and by the authorization of Congress.

On June 25, 1910, Congress passed a statute (Rivers and Harbors Act of 1910, 36 Stat. 630, 637), the material portions of which are as follows: "Be it enacted * * * That the following sums * * * are hereby, appropriated * * * to be expended under the direction of the Secretary of War and the supervision of the Chief of

Engineers, for the construction, completion, repair, and preservation of the public works hereinafter named: * * * Improving Delaware River, Pennsylvania, New Jersey, and Delaware: Continuing improvement and for maintenance from Fishers Point to Delaware Bay, eight hundred thousand dollars: Provided, That of this amount so much as may not be required for maintenance of improvement in accordance with the existing project shall be expended for widening the channel at the bends below the city of Philadelphia with a view to securing, so far as practicable, a channel of equal safety and efficiency in all its parts, and with a further view to securing an ultimate depth of thirty-five feet, in accordance with the project submitted in House Document Numbered Seven hundred and thirty-three, Sixty-first Congress, second session."

House Document 733, to which the act refers, which was a letter from the Secretary of War transmitting to Congress reports from the Chief of Engineers and division and district engineers with estimates setting forth a general project of improvement of the Delaware river from Philadelphia to the sea. It is true that this document, referring to the section of the channel here involved at Pea Patch Island, says, "No new works are proposed in this section," but it also states, "Any project adopted for this improvement should be subject to such minor modification as may be further desirable in the execution of the work." An entire section of the document deals with the maintenance of dikes and points out that the construction of dikes is a necessary supplement to the work of dredging in maintaining a deep channel. But, apart from the precise language of various parts of the report, it is perfectly obvious from a reading of the whole that what Congress had before it and what is approved as a general project for the opening and maintenance of a channel from Philadelphia to the sea. It is equally clear that it was the intent to commit the Secretary of War a considerable discretion as to the details.

A reference to subsequent House Documents which were before the Congress when it made subsequent appropriations bears this out very strongly. Thus in 1924 the Rivers and Harbors Committee by resolution requested the Board of Engineers to re-examine and review the whole project set forth in House Document 733. Five years later on July 27, 1929, the report so requested was filed in a letter from the Chief of Engineers to the chairman of the Rivers and Harbors Committee, transmitting reports of the Board of Engineers and division and district engineers. In it the Pea Patch Island dike was included in the "program of training works recommended to reduce the cost of maintenance of the Delaware River between Philadelphia and the sea and to shorten the time in which the maintenance will reach a satisfactory status" and an estimate of $1,080,000 was given as the cost of this work. The view was expressed by both the Chief of Engineers and the Board as well as the district and division engineers that an extension of the system of dikes originally proposed did not require the further affirmative authorization by Congress, all of which was set out in the report.

With this document before it, Congress appropriated sufficient money to cover the work in the General Appropriation Act of 1930. Of course this was a lump sum amount and did not specify the purposes, but it was based on the estimates of the Chief of Engineers which went to Congress and which included money for this particular item.

Thereafter annual reports of the Chief of Engineers showed the progress of the work and were followed by annual appropriations under similar conditions. These appropriations were, inferentially at least, a legislative interpretation of the scope of the original act and the extent of the discretion delegated to the Secretary of War.

I can add nothing to the discussion of the principles of law involved which appears in the opinion of the Circuit Court of Appeals for the Seventh Circuit in Ryan v. Chicago, Burlington & Quincey Railroad Company, 59 F.(2d) 137, with particular reference to the decision of the Supreme Court in South Carolina v. Georgia, 93 U. S. 4, 23 L.Ed. 782.

IV. When the Gansfjord Case, 25 F.(2d) 736, 737, came to be heard on the merits, the District Court found that the allegations of negligence in the libel were sustained, but went on to say that those allegations were immaterial, that the plain meaning "does not make the vessel's liability for damages for defacing, destroying, or injuring such property depend upon proof of willful or malicious intent, or negligence or want of skill, nor does it permit of a defense that the collision with the shore resulted from a mere mariner's error of judgment." In view of the nature of the action and the terms of the stat-

ute, I am inclined to agree with this view, but, since there was plainly negligence in this case, I shall deal with it in the same way that the District Court in the Gansfjord Case did, and hold that, if the question of negligence is material under the statute, the damage was entirely due to fault on the part of the Barbara Cates.

### Findings of Fact.

Pea Patch Island lies to the west of the channel of the Delaware river. The dike extends northwardly from its northern end, a distance of over two and one-half miles curving from west to east generally in the arc of a large circle and conforming to the bend in the river at that point. Vessels going up the river pass Pea Patch Island on the Newcastle Range. About a mile above the northern end of Pea Patch Island Newcastle Range turns into Bulkhead Bar Range, a short reach of about half a mile and a turn of about eighteen degrees. The next turn is into Deepwater Point Range thirty-three degrees toward the east.

The Barbara Cates, having reached the upper end of Bulkhead Bar Range, failed to turn on Deepwater Point Range, but continued on, changing its course about one point to starboard, and, not observing the dike until too late, ran into it.

I cannot accept the pilot's statement that the Bulkhead Bar Range lights were so blinding that he was wholly unable to see ahead of him. He said: "They flashed right down on the deck of the ship. They mesmerized you. It was impossible to see two feet ahead of the ship. The lights were too powerful." No doubt the lights were powerful, but this statement is clearly an exaggeration, as the Bulkhead Bar's forward range light would be over a mile and a half away. I believe the lights on the dike were visible. In addition, there were other aids to navigation which were not availed of. The entire reach of the Bulkhead Bar Range in the navigable channel is covered by an occulting red sector fixed light. As soon as the ship gets out of the red sector light, the pilot must know that he is at the intersection of the two ranges and that a change of course of some thirty-two degrees is necessary in order to get upon the Newcastle Range.

Even accepting as competent the evidence that after the accident the government reduced the power of the Bulkhead Bar Range lights and increased that of the lights on the jetty, it by no means follows that the pilot could not have seen the jetty lights had he been observant.

It may be that the cause of the accident was, as the pilot testified, his mistake in taking a flashing white buoy at the northerly end of Deepwater Point Range and on the west side of the channel for the forward Deepwater Point Range light, and that the reason he failed to make the turn was that he was expecting to pick up the rear range light. But I do not believe that the haze on the Jersey side entirely obscured the Deepwater Range lights, and I think that the pilot's mistake was simply an error of observation on his part.

Decree accordingly.